552 A.2d 1075

**COMMONWEALTH of Pennsylvania, Appellant,**

v.

**Gordon FERGUSON, Appellee.**

**COMMONWEALTH of Pennsylvania, Appellant,**

v.

**Blanche FERGUSON, Appellee.**

Superior Court of Pennsylvania.

Submitted Jan. 12, 1988.

Filed Dec. 19, 1988.

24

Joseph A. Curcillo, III, Assistant District Attorney, Harrisburg, for Com.

Christopher Shaw, Assistant Public Defender, Clearfield, for appellees.

Before OLSZEWSKI, TAMILIA and KELLY, JJ.

KELLY, Judge:

The Commonwealth appeals from judgments of sentence imposed upon appellees, Gordon and Blanche Ferguson, following the acceptance of their guilty pleas to welfare fraud violations. The Commonwealth contends that the sentences imposed were illegal in that the trial court failed to impose a restitution order as mandated by 62 Pa.S.A. § 481(c). We agree that restitution is mandatory rather than discretionary in such cases; and therefore, vacate judgment of sentence and remand for resentencing.

## FACTS AND PROCEDURAL HISTORY

Between May 1984 and October of 1986, appellees, Gordon and Blanche Ferguson, willfully and fraudulently misrepresented and failed to disclose family income to the Clearfield County Board of Assistance in violation of 62 Pa.S.A. § 481(a). During this period, appellees illegally obtained approximately $3,412.00 in public assistance funds and food coupons.

On October 24, 1986, complaints were filed against appellees charging them with two counts each of welfare fraud under 62 Pa.S.A. § 481(a). Appellees were arraigned on those charges on January 9, 1987; pleas of not guilty were entered. On January 16, 1987, both appellees entered open guilty pleas to the charges and specifically acknowledged in writing that the sentence, including restitution, fines, and costs would be left to the trial court.

On March 27, 1987, the trial court formally accepted the appellees' guilty pleas and proceeded to sentence appellees. Appellees were each sentenced to two years probation, aggregate fines of $600.00 each, and to pay the costs of prosecution. As a condition of probation each were to pay a minimum of $75.00 per month on the fines imposed. The trial court specifically declined to impose restitution orders as part of the sentence because the complaining claims agent of the Department of Public Welfare failed to appear at sentencing. Formal judgments of sentence were not entered, however, until April 13, 1987.

On April 24, 1987, the Commonwealth filed timely notices of appeal to this Court.[1] On April 27, 1987, the trial court directed the Commonwealth to file statements of matters complained of on appeal. On April 29, 1987, the Commonwealth filed timely motions to modify the judgments of sentence based upon the trial court's alleged error in failing to order restitution in compliance with 62 Pa.S.A. § 481(c). On May 27, 1987, the Commonwealth repeated that allegation in its statements of reasons for appeal.

On May 29, 1987, following a hearing, the trial court denied the Commonwealth's motions to modify the sentences. In accordance with Pa.R.A.P. 1925(a), the trial court filed a memorandum opinion on July 2, 1987, which explained its decision not to impose orders for restitution as follows:

On March 26, 1987, the above-captioned Defendant entered pleas of guilty to charges of Public Assistance Funds and Bonus Food Coupons, said offenses being defined in § 481(a) of the Public Welfare Code, Act 75 of 1982, both misdemeanors of the third degree, and was sentenced the same date to probation, a fine and Court costs. The Court specifically did not enter an Order for restitution. The Commonwealth now appeals claiming

1. *See Commonwealth v. Cavanaugh,* 500 Pa. 313, 456 A.2d 145 (1983) (the thirty day period for filing notice of appeal commences upon formal entry of judgment of sentence, rather than when the sentence to be entered was first announced in open court).

that the Defendant should have been required to make restitution.

In prosecutions of this nature this Court has consistantly [sic] and continually requested the prosecuting agent of the Department of Public Assistance to be present at sentencing just as it requires every prosecutor in every criminal case to be present when sentence is imposed. Just as consistantly [sic] the complainant has failed or refused to appear. This Court has gone so far as to require the District Attorney's Office to insist upon the complainants presence to no avail. As noted in the sentencing proceedings to 87–8–CRA, this Court inquired as to whether the complainant was present and was told he was not, although notice had been sent.

In cases of this nature, the Court has specific questions of the complainant before it will enter an Order for restitution, among them being whether the Defendant is still receiving an assistance grant, how much restitution is claimed and other circumstances concerning the grant that the Defendant had been receiving. Further, this Court had advised that without the complaining individual present at sentencing, an Order for restitution would not be made. It is this Court's opinion that in failing or refusing to appear, the complainant forfeited any claim for restitution.

(Trial Ct.Op. at 1–2).

On appeal, the Commonwealth renews its contention that 62 Pa.C.S.A. § 481(c) mandates restitution and that the sentences imposed which failed to order restitution were illegal. The appeals have been briefed and argued and are now before us for disposition.

### JURISDICTION

■ Initially, we note that the Commonwealth's appeals are properly before this Court. The gist of the Commonwealth's sole contention in these appeals is that the trial court was without *authority* to impose sentences on appellees which did not require them to pay restitution of any

moneys fraudulently obtained. (Commonwealth's Brief at 1–3). An allegation that the trial court was without constitutional or legislative authority to enter the sentence imposed constitutes a challenge to the legality of sentence. *See generally Commonwealth v. Hartz*, 367 Pa.Super. 267, 273–77, 532 A.2d 1139, 1143–44 (1987) (Cirillo, P.J., concurring) (exhaustively collecting cases involving challenges to the legality of sentence and observing that all of the cases involved allegations that the trial court was without constitutional or legislative authority to enter the sentence imposed); *see e.g. Commonwealth v. Lee*, 363 Pa.Super. 400, 526 A.2d 405 (1987) (Commonwealth contention that the trial court erred in failing to impose a mandatory minimum sentence on a recidivist drunk driver was a challenge to the legality of the sentence imposed). Challenges to the legality of sentence are appealable as of right, rather than by allowance of appeal. *See Commonwealth v. Carr*, 375 Pa.Super. 168, 171, 543 A.2d 1232, 1234 (1988); 42 Pa.C.S.A. §§ 9781(a), 9781(b).

## QUESTIONS PRESENTED

The first question before this Court is one of statutory construction. Specifically, we must determine whether the restitution provision of 62 Pa.S.A. § 481(c) is discretionary or mandatory. If it is discretionary, then the sentence imposed could not be deemed illegal and the Commonwealth's appeals must fail. On the other hand, if it is mandatory, then we must determine whether the Commonwealth's right to restitution was forfeited by the non-appearance of the complaining claims agent at sentencing.

## I. CONSTRUCTION OF 62 Pa.S.A. § 481(c)

In construing the enactments of the legislature, appellate courts must refer to the provisions of the Statutory Construction Act, 1 Pa.C.S.A. §§ 1901 *et seq.* The legislature has directed that, "[i]n the construction of the statutes of the Commonwealth, the rules set forth in this chapter shall be observed, unless the application of such rules would

result in construction inconsistent with the manifest intent of the General Assembly." 1 Pa.C.S.A. § 1901. In 1 Pa.C.S.A. § 1921(a & b) the legislature further explained that:

(a) The object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly. Every statute shall be construed, if possible, to give effect to all its provisions.

(b) *When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit.*

(Emphasis added).

## A. PLAIN MEANING

■ Thus, we must first determine whether the issue may be resolved by reference to the express language of the statute. The statute at issue provides in pertinent part:

**62 Pa.S.A. § 481**

(c) *Any person committing a crime enumerated in subsection (a) shall be ordered to pay restitution of any moneys he has received by reason of any false statement, misrepresentation, impersonation, failure to disclose required information or fraudulent means.* Restitution ordered under this subsection may be paid in a lump sum, by monthly installments or according to such other schedule as is deemed just by the sentencing court. Notwithstanding the provisions of 18 Pa.C.S. § 1106(c)(2) (relating to restitution for injuries to person or property) to the contrary, the period of time during which the offender is ordered to make restitution may exceed the maximum term of imprisonment to which the offender could have been sentenced for the crime of which he was convicted, if the sentencing court determines such period to be reasonable and in the interests of justice.

(Emphasis added). The statute unequivocally provides that restitution "shall be ordered." The question, therefore, is whether "shall" means shall, or whether "shall" may mean "may."

It is a cardinal rule of statutory construction that, "words and phrases shall be construed according to rules of grammar, and according to their common and approved usage; ...." 1 Pa.C.S.A. § 1903. The term "shall" in common legal usage has been defined as follows:

**Shall.** As used in statutes, contracts, or the like, this word is generally imperative or mandatory. In common or ordinary parlance, and in its ordinary signification, the term *'shall' is a word of command, and one which has always or which must be given a compulsory meaning; as denoting obligation. It has a peremptory meaning, and it is generally imperative or mandatory. It has the invariable significance of excluding the idea of discretion,* and has the significance of operating to impose a duty which may be enforced, particularly if public policy is in favor of this meaning, or when addressed to public officials, or where a public interest is involved, or where the public or persons have rights which ought to be exercised or enforced, unless a contrary intent appears. *People v. O'Rourke,* 124 Cal.App. 752, 13 P.2d 989, 992. [1932].

But it may be construed as merely permissive or directory (as equivalent to 'may'), to carry out the legislative intention and in cases where no right or benefit to any one depends on its being taken in the imperative sense, and where no public or private right is impaired by its interpretation in the other sense. *Wisdom v. Board of Sup'rs of Polk County,* 236 Iowa 669, 19 N.W.2d 602, 607, 608 [1945].

*Black's Law Dictionary,* at 1233 (5th Ed.1979). It has been defined similarly with regard to its general rather than its legal usage. *See e.g. Webster's Ninth New Collegiate Dictionary,* at 1081 (1983) ("will have to: must; will be able to: can; used to express a command or exhortation; used in laws, regulations or directives to express what is mandatory"). The above definitions suggest that the principle and common usage of the term would require a mandatory

rather than discretionary construction of "shall" as used in 62 Pa.S.A. § 481(c).

■ Despite the distinction in meaning between "shall" and "may"; however, appellate courts of this Commonwealth have declined to construe "shall" as mandatory and "may" as discretionary. Instead, the question of whether a statute will be deemed mandatory or discretionary has been decided with reference to the perceived intent of the legislature with respect to the use of the terms "shall" and "may" in the particular statute at issue. *See Tyler v. King,* 344 Pa.Super. 78, 84–86, 496 A.2d 16, 19–20 (1985) (collecting cases). Thus, the appellate courts of this Commonwealth have, in effect, declared that the term "shall" is sufficiently ambiguous to avoid application of the plain meaning rule of 1 Pa.C.S.A. § 1921(c), and the common and approved usage rule of 1 Pa.C.S.A. § 1903.

The willingness of the courts of this Commonwealth to find ambiguity in such cases is not necessarily a salutary trait. In his essay on statutory construction, Justice Felix Frankfurter, warned:

[w]hat courts do with legislation may in turn deeply affect what [a legislature] will do in the future. Emerson says somewhere that mankind is as lazy as it dares to be. Loose judicial reading makes for loose legislative writing. It encourages the practise illustrated in a recent cartoon in which a senator tells his colleagues 'I admit this new bill is too complicated to understand. We'll just have to pass it to find out what it means.'

\* \* \* \* \* \*

But there are more fundamental objections to loose judicial reading. In a democracy the legislative impulse and its expression should come from those popularly chosen to legislate and equipped to devise policy, as courts are not. The pressure on legislatures to discharge their responsibility with care, understanding and imagination should be stiffened, not relaxed. Above all, they must not be encouraged in irresponsible or undisciplined use of language. In the keeping of legislature perhaps more

than in that of any other group is the well-being of their fellow-men. Their responsibility is discharged ultimately by words. They are under a special duty therefore to observe that 'Exactness in the use of words is the basis of all serious thinking. You will get nowhere without it. Words are clumsy tools, and it is very easy to cut one's fingers with them, and they need the closest attention in handling; but they are the only tools we have, and imagination itself cannot work without them. You must master the use of them, or you will wander forever guessing at the mercy of mere impulse and unrecognized assumptions and arbitrary associations, carried away with every wind of doctrine.

Frankfurter, *Reflections on Reading Statutes*, 47 Colum.L. Rev. 327, 376–77 (1947).

It would be a simple matter for the courts of this Commonwealth to inform the legislature that, with regard to the terms "shall" and "may," unless a contrary intent is expressly stated, we will presume that the legislature intended "shall" to be mandatory and "may" to be discretionary. *Cf.* JIRB Rule 23(e) (" '[s]hall' is mandatory and 'may' is permissive"). Requiring such discipline in expression from legislative draftsmen would not seem an unreasonable requirement or an unattainable goal. Nonetheless, as we have fostered imprecision regarding the use of the terms "shall" and "may" by our prior decisions, we cannot impose strict construction of the term here without risking violence to the legislative intent. Moreover, as several of the cases which deem "shall" to be sufficiently ambiguous to require further inquiry into the legislative intent were decided in our Supreme Court, we do not consider the adoption of the above presumption to be within our province.

■ We note, however, that even under the current loose construction approach, the term "shall" is *generally* construed as creating a mandatory duty, and that it has only been in rare cases involving matters of time or form that the word "shall" has been construed as creating only a discretionary or directory duty. *See Commonwealth v.*

34

*Filius*, 346 Pa.Super. 434, 499 A.2d 1078 (1985); *Wilkes-Barre Area Vocational School v. Greater Nanticoke Area School District*, 115 Pa.Cmwlth. 73, 539 A.2d 902 (1988); *see also Zimmerman v. O'Bannon*, 497 Pa. 551, 442 A.2d 674 (1982); *James F. Oakley, Inc. v. School District of Philadelphia*, 464 Pa. 330, 346 A.2d 765 (1975); *Francis v. Corleto*, 418 Pa. 417, 211 A.2d 503 (1965); *Division 85, Amalgamated Transit Union v. Port Authority*, 417 Pa. 299, 208 A.2d 271 (1965); *Commonwealth v. Pryor*, 347 Pa.Super. 239, 500 A.2d 811 (1985); *Commonwealth v. Kowell*, 209 Pa.Super. 386, 228 A.2d 50 (1967); *Board of Pensions & Retirement v. Hodge*, 72 Pa.Cmwlth. 59, 455 A.2d 1270 (1983); *Matter of Columbia Borough*, 24 Pa. Cmwlth. 190, 354 A.2d 277 (1976).

## B. LEGISLATIVE INTENT

We must look to the legislative intent. Section 1921(c) of the Statutory Construction Act provides:

When the words of the statute are not explicit, the intention of the General Assembly may be ascertained by considering, among other matters:

(1) The occasion and necessity for the statute.

(2) The circumstances under which it was enacted.

(3) The mischief to be remedied.

(4) The object to be attained.

(5) The former law, if any, including other statutes upon the same or similar subjects.

(6) The consequences of a particular interpretation.

(7) The contemporaneous legislative history.

(8) Legislative and administrative interpretations of such statute.

1 Pa.C.S.A. § 1921(c). We shall attempt to ascertain the legislative intent by considering these factors.

### 1. HISTORICAL AND POLITICAL CONTEXT

■ First, we consider the occasion and necessity for the statute, the circumstances under which it was enacted, the

mischief to be remedied; the object to be attained; and the former law, including other statutes upon the same or similar subjects. 1 Pa.C.S.A. § 1921(c)(1–5). Essentially, we consider the historical and political context in which the legislation at issue was adopted.

The early law of this Commonwealth regarding the relief of the poor may be summarized as follows. The father, grandfather, mother, grandmother, and children of any poor person unable to work were required to provide subsistence support to their poor relation. Likewise, husbands were required to provide subsistence support to their wife and children. These obligations could be enforced by court order and imprisonment for contempt.

If no relative was able to provide support, then the local community was required to provide subsistence support. Poor persons on relief were to be put to work if able bodied, and removed from the community if the poor person did not have a lawful settlement there. Blind, crippled, and insane poor were maintained in their homes or in public almshouses. When the poor person died, the community was entitled to recoup the expense of the support provided by claiming whatever estate the poor person left.

Though the terms of the early poor laws seem hardly likely to induce fraudulent claims for relief, the early poor laws nonetheless guarded against such claims by requiring lawful "settlement" (residency) and by providing that no person was to be entered into the Poor Book and given relief except by order of two magistrates or justices of the peace.[2] These laws were derived from earlier English poor

2. *See* "The General Poor Relief Act," 1925, P.L. 762, No. 413 (1925); "Act of June 13, 1836," P.L. 551, No. 168 (1835–36); "An Act for the Relief of the Poor (1771)," *reprinted in* 1 *Sm.L.* 332, 332–50 (1809) (text and note tracing poor law from 1771 to 1809); "Act for Relief of the Poor (1705–06)," *reprinted in* I *Statutes at Large of Pennsylvania* 251, 251–54 (1976); "An Act for the Better Provisions for the Poor Within this Province and Territories of 1700," *reprinted in* I *Statutes at Large of Pennsylvania* 20 (1976); "The Duke of York's Laws of 1664," *reprinted in* I *Statutes at Large of Pennsylvania* 82, 82–83 (1976). Regarding the origin, development, and operation of the above laws, *see generally* Beckman, "Debts and Debtors," I *Statutes at Large of*

laws.[3] The prior English law had itself evolved from parish customs regarding the allocation of a portion of the tithe to the relief of the poor.[4]

The administration of Pennsylvania's early system of poor laws was fragmented and decentralized. By 1936, poor relief was being administered by a patchwork of nearly 500 agencies whose related functions and responsibilities inevitably resulted in overlapping of jurisdiction, duplication of effort, conflict of parties, and multiplication of costs. In addition to the traditional poor boards, Pennsylvania had created by then special funds for assistance of mothers, the blind, the aged, veterans, and the unemployed. *See Poor District Case (No. 1)*, 329 Pa. 390, 395–96 & n., 197 A. 334, 336–37 & n. (1938); *see also* "The Unemployment Compensation Law," 1936 2d Ex, P.L. 2897, No. 1; "The Blind Pension Act," Ex 1933, P.L. 246, No. 61; "Old Age Assistance Act," Ex 1933, P.L. 282, No. 64; "Old Age Commission Act," 1923, P.L. 189, No. 141; "World War Veteran's Compensation Act," 1923, P.L. 236, No. 156; "Mother's Assistance Act," 1913, P.L. 118, No. 80. Significantly, each of the above statutes contained penalty provisions authorizing the imposition fines and/or imprisonment upon fraudulent claimants. The general poor law had not

*Pennsylvania* 32, 32–33 (1976); Scott, *State Government in Pennsylvania,* Ch. 19 "Poor Districts and School Districts," at 187–91 (1917); Bonsall, *Handbook of the Social Laws of Pennsylvania,* Ch. 4 "Poor Laws," at 35–43 (1914); Howard, *Local Constitutional History,* at 191–202 (1889); Beitel, *Poor Laws of Pennsylvania, passim* (1889).

3. *See* Howard, *supra* at n. 2, at 43–49 & 191–202; *compare* "An Act for Relief of the Poor (1771)," *reprinted in* 1 *Sm.L.* 332, 332–47 (1809), *and* "An Act for Relief of the Poor," 43 Elizabeth, c. 2 (1601), *reprinted in* 7 *Statutes at Large of England* 30, 30–37 (1763).

4. *See* Ely, *The Eighteenth Century Poor Laws in West Riding of Yorkshire,* 30 J.Am.L.Hist. 1, 1–24 (1986) (analyzing the operation of the poor law between 1750 and 1766); Howard, *supra,* at n. 2, at 191–94 (tracing the origins of English poor law to 601 A.D.); *Report From His Majesty's Commissioner's for Inquiring Into the Administration and Practical Operation of the Poor Laws,* at 5–13 (1834) (tracing English statutes regarding the poor from 1388 to 1601); I *Nolan on the Poor Laws,* 1, 1–6 (4th ed. 1825) (tracing the English poor law from 1139 A.D.); 16 *Viner's Abridgment,* 414, 414–31 (2d ed. 1793) (providing a synopsis of the poor law and its operation from 1601 to 1793).

provided for such penalties. *See* "The General Poor Relief Act," 1925, P.L. 762, No. 413.

The Great Depression highlighted and exacerbated the substantive and administrative difficulties caused by the fragmented poor relief system. In 1936, the "Goodrich Report" of the Pennsylvania Committee on Public Assistance and Relief became both a catalyst and a blueprint for reform. Among the acts passed as a direct result of the Goodrich Report was the "Public Assistance Law," 1937, P.L. 2051, No. 399, which abolished the fragmented agencies and replaced them with 67 county boards which were to distribute relief benefits from funds allocated to them by the Commonwealth Department of Public Assistance. Significantly, the new act contained the following provision (which is the direct antecedent of the statute construed in the instant case):

> Section 13. Penalties.—Any person who, by means of a wilfully false statement or misrepresentation, or by impersonation or other fraudulent means, secures, or attempts to secure, or aids or abets any person in securing assistance under this act shall be guilty of a misdemeanor, and, upon conviction thereof, shall be sentenced to pay a fine not exceeding one thousand dollars ($1000.00), or to undergo imprisonment not exceeding one year, or both, at the discretion of the court, and also *may be sentenced to make restitutions of any moneys he has received by reason of any such false statement, misrepresentation or fraudulent means.*

(Emphasis added). The original restitution provision was plainly discretionary.

The above provision underwent a series of revisions between 1936 and 1982, when the present provision was enacted. In 1937, the provision was amended as follows:

> Section 13. Penalties.—(a) Any person who, *either prior to, or at the time of, or subsequent to the application for assistance,* by means of a wilfully false statement or misrepresentation, or by impersonation or other fraudulent means, secures, or attempts to secure, or aids or

abets any person in securing assistance under this act shall be guilty of a misdemeanor, and, upon conviction thereof, shall be sentenced to pay a fine not exceeding [one thousand dollars ($1,000.00)] *five hundred dollars* ($500.00), or to undergo imprisonment not exceeding [one year] *six months,* or both, at the discretion of the court, and also [may] *shall* be sentenced to make restitution of any moneys he has received by reason of any such false statement, misrepresentation, *impersonation,* or fraudulent means.

1939, June 26, P.L. 1091, No. 384 (brackets indicate deletion, emphasis indicates additions). Though the amount of the fine and imprisonment authorized was reduced, *the discretionary restitution provision was plainly made mandatory. See* Strauss & Rome, *The Child and the Law in Pennsylvania,* at 110 (1943) (construing the act to provide that, "restitution of moneys received as a result of fraud *must* be made." (Emphasis added).

When the Public Welfare Code was enacted in 1967, the penalty provision was amended to provide:

### § 481. False statements; penalty

(a) Any person who, either prior to, or at the time of, or subsequent to the application for assistance, by means of a wilfully false statement of misrepresentation, or by impersonation or other fraudulent means, secures, or attempts to secure, or aids or abets any person in securing assistance under this article shall be guilty of a misdemeanor, and, upon conviction thereof, shall be sentenced to pay a fine not exceeding one thousand dollars ($1,000), or to undergo imprisonment not exceeding one year, or both, and also *shall be sentenced to make restitution of any moneys he has received by reason of any such false statement, misrepresentation, impersonation, or fraudulent means.*

(b) Any person who, either prior to or at the time of or subsequent to the application for assistance, by means of a wilfully false statement or misrepresentation, or by impersonation, or other fraudulent means, secures or

attempts to secure assistance not exceeding three hundred dollars ($300) under this article shall, upon conviction thereof in a summary proceeding, be sentenced to make restitution of such assistance, and to pay a fine of not more than two hundred dollars ($200), and, in default of making restitution and the payment of the fine imposed, to undergo imprisonment not exceeding sixty days. 1967, June 13, P.L. 30, No. 21, art. 4, § 481, *codified at* 62 Pa.Code § 481. (Emphasis added). This act provided for gradation of welfare fraud based upon the amount involved, *retained the mandatory restitution provision*, and specifically authorized imprisonment upon default of making restitution.

In 1976, the above provision was amended as follows: Section 481. False Statements; Penalty.—(a) Any person who, either prior to, or at the time of, or subsequent to the application for assistance, by means of a wilfully false statement of misrepresentation, or by impersonation or other fraudulent means, secures, or attempts to secure, or aids or abets any person in securing assistance, *or Federal food stamps*, under this article shall be guilty of a misdemeanor, and, upon conviction thereof, shall be sentenced to pay a fine not exceeding one thousand dollars ($1,000), or to undergo imprisonment not exceeding one year, or both, and also shall be sentenced to make restitution of any moneys he has received by reason of any such false statement, misrepresentation, impersonation, or fraudulent means.

(b) Any person who, either prior to or at the time of or subsequent to the application for assistance, by means of a wilfully false statement or secures or attempts to secure assistance *or Federal food stamps* not exceeding three hundred dollars ($300) under this article shall, upon conviction thereof in a summary proceeding, be sentenced to make restitution of such assistance, and to pay a fine of not more than two hundred dollars ($200). [and, in default of making restitution and the payment of the fine imposed, to undergo imprisonment not exceeding sixty

days.] *When having available sufficient means or the ability to acquire such means, wilfull failure to make restitution and pay the fine imposed shall result in imprisonment not exceeding sixty days.*

(c) *There shall be a four-year statute of limitations on all offenses under this section.*

1976, June 15, P.L. 993, No. 202, § 481 (brackets indicate deletions, emphasis indicates additions). These revisions brought food stamp fraud expressly within the scope of the provision, *retained the mandatory restitution provision,* limited imprisonment to cases of wilful default of making restitution or paying fines, and imposed a four year statute of limitations on the prosecution of welfare fraud offenses under the act.

In 1982, the 1976 provision was revised to provide as follows:

### § 481. False statements; investigations; penalty

(a) Any person who, either prior to, or at the time of, or subsequent to the application for assistance, by means of a wilfully false statement or misrepresentation, or by impersonation or other fraudulent means, secures, or attempts to secure, or aids or abets or attempts to aid or abet any person in securing assistance, *or Federal food stamps,* commits a crime which shall be graded as provided in subsection (b).

(b) Any person violating subsection (a) commits the grade of crime determined from the following schedule:

| Amount of Assistance or Food Stamps | Degree of Crime |
| --- | --- |
| $3,000 or more | Felony of the third degree |
| $1,500 to $2,999 | Misdemeanor of the first degree |
| $1,000 to $1,499 | Misdemeanor of the second degree |
| $999 and under, or an attempt to commit any act prohibited in subsection (a) | Misdemeanor of the third degree |

Pursuant to 42 Pa.C.S. § 1515(a)(7) (relating to jurisdiction and venue), jurisdiction over cases graded a misdemeanor of the third degree under this section shall be vested in district justices.

(c) *Any person committing a crime enumerated in subsection (a) shall be ordered to* pay *restitution of any moneys he has received by reason of any false statement, misrepresentation, impersonation, failure to disclose required information or fraudulent means.* Restitution ordered under this subsection *may* be paid in a lump sum, by monthly installments or according to such other schedule as is deemed just by the sentencing court. Notwithstanding the provisions of 18 Pa.C.S. § 1106(c)(2) (relating to restitution for injuries to person or property) to the contrary, the period of time during which the offender is ordered to make restitution *may* exceed the maximum term of imprisonment to which the offender could have been sentenced for the crime of which he was convicted, if the sentencing court determines such period to be reasonable and in the interests of justice.

(d) There shall be a four-year statute of limitations on all crimes enumerated in subsection (a).

(e) The Treasury Department shall have the power to investigate and prosecute any case involving replacement of or duplicate receipt of or altered assistance checks and shall have the power to collect any funds as a result of such investigations and prosecution. For purposes of this section those employes of the Treasury Department as are designated 'investigators' are given the power and authority to subpoena any document for review or audit and may question and subpoena any person believed to have any knowledge in such cases. The Treasury Department shall make such rules and regulations as may be necessary to carry out the provisions of this section. 1982, April 8, P.L. 231, No. 75, § 21 (effective in 60 days). (Emphasis added). The act provided a new standard for grading the offenses, *retained mandatory restitution,* authorized periodic payments toward restitution ordered, and

exempted restitution orders under this provision from the limits upon the period during which restitution payments could be required under 18 Pa.C.S.A. § 1106(c)(2).

Plainly, the mischief to be remedied by the foregoing statutes was welfare fraud. Pennsylvania has a paramount interest in seeing that its limited public assistance funds are distributed as provided by law. *See Wyman v. James*, 400 U.S. 309, 319–20, 91 S.Ct. 381, 386–87, 27 L.Ed.2d 408, 414 (1971). If some welfare recipients receive more than their rightful share of these finite resources through fraud, then it is likely that other needy persons will be adversely affected either by reductions in assistance, or by the Commonwealth's inability to increase assistance. *Cf. Jacquet v. Westerfield*, 569 F.2d 1339, 1340 (5th Cir.1978). Moreover, deterrence of welfare fraud is necessary to maintain public support for such programs. Prior to the final Senate vote on the 1976 amendments, Senator Kury expressed that concern as follows:

> No system can function if its integrity is under attack. No one here needs to be reminded that the integrity of public welfare in Pennsylvania is less than sound. The plain fact is that there are a host of hard working, productive, taxpaying citizens in this State who look at the welfare program and conclude that there are a lot of people getting something for nothing out of it at their expense. That outrages them, and in many respects, that outrage is justified. That is why House Bill No. 694 is so important.
>
> It is a measure which, in its largest sense, attempts to reinforce the integrity of the welfare system. It is a measure which says to the productive citizens of this State, we in the General Assembly are intent in rectifying the inequities of the welfare system. It says that we are serious in our efforts to curb the potential for fraud or abuse of that system.
>
> \* \* \* \* \* \*

The general public is very suspicious of the welfare program as it currently functions. Until that suspicion is

overcome, welfare will never achieve a position of widespread public acceptance. Without that acceptance, it just cannot function properly.

1 *Sen.Leg.J.* 1742–43 (June 22, 1976). We believe these remarks are indicative of the sentiments which underly welfare fraud sanctions in general. *Cf. Bowen v. Roy,* 476 U.S. 693, 709, 106 S.Ct. 2147, 2157, 90 L.Ed.2d 735, 751 (1986) *quoting* 127 Cong.Rec. 24783 (1981) ("[w]e know that however generously motivated Americans may be to furnish resources to the poor to enable them to survive, ... they understandably object if they believe that those resources are being abused or wasted....); Clark, *Cracking Down on Fraud, Waste, Abuse and Error,* 11 National Journal 96, 96 (1979) ("[u]nless these [reform] efforts succeed, the [Carter] Administration fears, Congress may kill the social programs which breed most of the fraud and waste.").

Deterrence of welfare fraud is not an easy task:

As welfare programs have grown, so have opportunities for cheating. Isolating individual cases is difficult, time consuming and expensive for federal and state investigators; recouping misspent funds is an even taller order.

Demkovich, *Welfare Cheating—Dealing With the Problem Not the Image,* 14 National Journal 1719, 791 (1982) (outlining federal initiatives to deter welfare fraud, waste and error during the first two years of the Reagan Administration).[5] Moreover, in large cities like Philadelphia, limited law enforcement resources are often by necessity focused on combatting violent crime rather than welfare fraud, thus making the task even more difficult. *See Commonwealth, Department of Public Welfare v. Heckler,* 730 F.2d 923,

**5.** *See also* Clark, *supra* (outlining a 1979 Carter Administration proposal to address the problem of welfare fraud, waste and error); Stone, *Can't We Do Better?,* U.S. News and World Report, at 104 (April 11, 1977) (noting stalled efforts to check welfare fraud, waste, and error in the Nixon and Ford Administrations, and expressing hope for such efforts during the Carter Administration); *Computers and Leg Work,* U.S. News & World Report, at 26 (May 5, 1975) (noting increased pressure on states to reduce welfare fraud, the introduction of computers to detect violators, and the continued need for manpower and leg work).

924 (3rd Cir.1984) ('[d]ue to a dearth of funds and a surfeit of violent crimes, the Philadelphia DA had lagged far behind the rest of the state in prosecuting welfare fraud cases referred by DPW.").

Nonetheless, welfare reform efforts have begun to show encouraging results. *See generally* Demkovich, *supra; see also Bowen v. Roy, supra,* 476 U.S. at 710–11, 106 S.Ct. at 2157–58, 90 L.Ed.2d at 751–52 (noting the success of computer "matching" programs in detecting welfare fraud); *Commonwealth, Department of Public Welfare v. Heckler, supra,* 730 F.2d at 924 (noting that following adoption of a cost-sharing plan with the state, the number of welfare fraud prosecutions in Philadelphia jumped from 16 in 1980 to 400 in 1982 and that by March 1983 the Philadelphia DA had obtained restitution orders totalling $905,588). In fiscal year 1987–88 the Pennsylvania Department of Welfare's Office of Fraud and Abuse Investigation and Recovery recovered a staggering $2,820,115.00 in Public Assistance claims and an additional $442,527.00 in Food Stamp claims. *See BSC–056 & RMS–056 Reports,* unpublished (Pa.D.P.W. 1988) (available from the Office of Fraud and Abuse Investigation and Recovery); *see also Office of Fraud and Abuse Investigation and Recovery Final Report Fiscal Year 1986–87, passim* (Pa.D.P.W.1988) (providing detailed statistics concerning welfare fraud restitution). Plainly, restitution orders have become an important component of welfare fraud sanction and deterrence efforts.

In sum, we find that the historical and political context in which the statute was enacted supports a conclusion that the restitution provision of the 1982 act was intended to retain the mandatory character of the 1937, 1967, and 1976 acts which preceded it. Such a construction is likewise in harmony with our analysis of the mischief to be remedied and the object to be attained by the provision, *i.e.* to sanction and deter welfare fraud.

### 2.

Next, we consider the consequences of particular constructions. 1 Pa.C.S.A. § 1921(c)(6). The legislature is

presumed not to have intended a construction which renders a statute unconstitutional or impossible of execution or which leads to absurd or unreasonable results. 1 Pa.C.S.A. § 1922 (1 & 3).

If 62 Pa.S.A. § 481(c) is construed as vesting in the trial courts discretion to impose restitution of less than the full amount obtained by the welfare fraud, then there is a risk that potential welfare cheats may receive the impression that even if they are caught, crime may still pay. In the instant case, appellees defrauded the government of three thousand four hundred and twelve dollars ($3,412.00), yet they were sentenced to probation and aggregate fines of only twelve hundred dollars ($1,200.00). Such results appear to be at odds with the purpose of 62 Pa.S.A. § 481(c), which is to effectively sanction and deter welfare fraud.

Nonetheless, the results of such a construction are no more absurd or unreasonable than those which necessarily obtain in other contexts with respect to restitution orders subject to 18 Pa.C.S.A. § 1106(c)(2). It is not constitutional for a court to penalize a convict for failing to pay a fine or comply with a restitution order which he or she does not have the ability to pay. *See Bearden v. Georgia,* 461 U.S. 660, 103 S.Ct. 2064, 76 L.Ed.2d 221 (1983) (restitution); *Tate v. Short,* 401 U.S. 395, 91 S.Ct. 668, 28 L.Ed.2d 130 (1971) (fines).[6] Under 18 Pa.C.S.A. § 1106(c)(2) the duration of the restitution obligation period is limited to the time which the convict could have been imprisoned. As a result, the constitutional and statutory limitations combine to limit the maxi-

**6.** With respect to the meaning of the phrase "ability to pay, as used herein, we make two observations. First, while a convict may not be punished for failing to pay what he cannot pay, the court may require the convict to make sacrifices in order to be able to make restitution payments ordered. *See Commonwealth v. Madron,* 339 Pa.Super. 105, 107–08, 488 A.2d 331, 332–33 (1985). Second, even truly poor persons may be able to make small periodic payments toward fines or restitution orders. *See* Hillsman, Sishel & Mahoney, *Fines in Sentencing: A Study in the Use of Fine as a Criminal Sanction,* at 60–67 (U.S.Dept.J. 1984); *accord Jacquet v. Westerfield,* 569 F.2d 1339, 1341–43 (5th Cir.1978) (welfare recipients could be ordered to make restitution payments out of current welfare assistance funds so long as undue hardship did not result).

mum restitution recoverable regardless of the amount stolen or the loss or injury sustained.[7] This limitation upon the period during which restitution payments may be required apparently represents a *policy choice* made by the legislature between full restitution to crime victims with its punative, restitutional, and deterrent effects on one hand, and *perceived* rehabilitative benefits of limiting restitution during probation on the other. *See Commonwealth v. Erb*, 286 Pa.Super. 65, 82, 428 A.2d 574, 580–82 (1981); *Commonwealth v. Fuqua*, 267 Pa.Super. 504, 508, 407 A.2d 24, 25–27 (1979). In light of the similar results which must be deemed to have been intended in restitution cases governed by express limitations of 18 Pa.C.S.A. § 1106(c)(2), we cannot say that the results of a discretionary construction of 62 Pa.S.A. § 481(c) would be absurd or unreasonable.

If, on the other hand, 62 Pa.S.A. § 481(c) is construed to mandate entry of an order imposing an obligation to make full restitution of all funds fraudulently obtained without limitation on the time period during which restitution payments may be required, the statute will not be unconstitu-

7. For example, assume that a defendant is convicted of assaulting a person and causing injuries which, though not constituting serious bodily injury, nonetheless, resulted in medical expenses and lost wages in excess of $5,000.00. Assume also that the defendant is poor, and even making reasonable sacrifices, can only afford to make payments of $10.00 per month in restitution. The maximum sentence for the above offense (a second degree misdemeanor) is two years. *See* 18 Pa.C.S.A. §§ 1104(2), 2701. Because of 18 Pa.C.S.A. § 1106(c)(2), the total restitution recoverable would not exceed $2,400.00, which would be less than half the damage incurred by the victim.

Though the victim could seek the difference in civil court, the victim would be required to assume the expense of such litigation and might risk achievement of only a Pyrrhic victory as the civil judgment might be dischargable in bankruptcy. *Cf. Kelly v. Robinson*, 479 U.S. 36, 107 S.Ct. 353, 93 L.Ed.2d 216 (1986). Thus, 18 Pa.C.S.A. § 1106(c)(2) converts the shield from imprisonment which *Bearden* provided to poor convicts, into a sword with which criminals may sever themselves from financial responsibility for the consequences of their criminal acts. That this result was not intended from *Bearden* is evident from the fact that, in *Bearden,* the Supreme Court specifically suggested lengthening the period of repayment as one of the acceptable alternatives to imprisonment. *See Bearden v. Georgia,* 461 U.S. at 672, 103 S.Ct. at 2072, 76 L.Ed.2d at 232.

tional or impossible of execution. When full restitution is ordered, the discretionary authority expressly provided to permit periodic payments toward the full restitution ordered may be exercised in a manner consistent with the constitutional limitations set forth in *Bearden v. Georgia, supra.* Unlike restitution subject to 18 Pa.C.S.A. § 1106(c)(2), welfare fraud restitution has an unlimited repayment period. Consequently, the amount of restitution ordered need not be limited by the convict's ability to only make periodic payments in a limited amount.

Though an obligation to pay a large amount of welfare fraud restitution in relatively small periodic payments may result in a perpetual obligation hanging over the defendant, this appears to be the necessary and intended effect of the legislature's express decision to exempt 62 Pa.S.A. § 481(c) from the operation of 18 Pa.C.S.A. § 1106(c)(2). We note that while a convict may not constitutionally be punished for failing to make restitution payments he or she is incapable of making, a poor person has no right to discharge of a criminal restitution obligation on the basis of poverty. *Kelly v. Robinson,* 479 U.S. 36, 107 S.Ct. 353, 93 L.Ed.2d 216 (1986).

Thus, we find that neither construction is compelled or precluded based upon its consequences.

3.

Next, we consider the contemporaneous legislative history. 1 Pa.C.S.A. § 1921(c)(7). Though we find nothing remarkable with regard to contemporaneous legislation when the 1982 act was passed, we note that the 1976 act (which also provided that restitution of any moneys fraudulently obtained "shall be ordered") was enacted less than one month after the enactment of 18 Pa.C.S.A. § 1106, with its *expressly* discretionary language. Had the legislature intended to vest discretion in the trial courts to impose anything less than full restitution, it is apparent that they were well acquainted with the language necessary to unequivocally express such an intent.

4.

We are aware of no relevant legislative or administrative constructions of 62 Pa.S.A. § 481. *See* 1 Pa.C.S.A. § 1921(c)(8). Thus, we have exhausted the list of prescribed aids in ascertaining legislative intent. We note, additionally, though, that our Supreme Court has found an implication that the legislature intended "shall" to be construed as mandatory when "shall" and "may" are both used in the same subsection of a statute and the use of the terms is in apparently scrupulous adherence to their proper usage. *See Zimmerman v. O'Bannon, supra,* 442 A.2d at 678 (1982). Such an implication arises in the construction of 62 Pa.S.A. § 481(c), wherein "may" is twice used to denote obviously discretionary authority.

C.

Thus, despite the loose construction permitted the term "shall" when used in legislative enactments, we conclude that the ascertainable legislative intent indicates that 62 Pa.S.A. § 481(c) imposes upon the trial court a *mandatory* duty to impose an order of restitution as to any moneys obtained as a result of the welfare fraud of which the defendant is convicted.

## II. ALLEGED WAIVER OR FORFEITURE OF RESTITUTION

Though the sentences imposed did not include orders directing appellees to make restitution in accordance with the mandate of 62 Pa.S.A. § 481(c), the trial court did not purport to construe 62 Pa.S.A. § 481(c) as discretionary in declining to order full restitution. Rather, the trial court conceded its general duty to impose restitution, but deemed restitution to have been waived or forfeited by the claims agent's failure to appear at sentencing. This we find to have been *ultra vires.*

## A. WAIVER OF MANDATORY RESTITUTION

Illegality of sentence going to the jurisdiction or authority of the court cannot be waived. *See Commonwealth v.*

*Wallace,* 368 Pa.Super. 255, 533 A.2d 1051 (1987); *Commonwealth v. Hartz, supra.* A sentence which fails to impose a statutorily mandated penalty is illegal and beyond the authority of the court to impose. *Commonwealth v. Lee, supra.* The discussion in Part I of this opinion establishes that the trial court is under a legal obligation to impose an order of restitution with respect to any moneys fraudulently obtained. Hence, a sentence which failed to order such restitution was illegal, and such illegality could not be waived by the Commonwealth.

Other "mandatory" sentence provisions have been construed to vest discretion in the prosecutor as to whether or not to invoke the statute based upon the existence of a provision which requires notice by the prosecutor of *the Commonwealth's intent* to seek application of the statute. *See Commonwealth v. Pittman,* 515 Pa. 272, 528 A.2d 138 (1987); *see also Commonwealth v. Harton,* 518 Pa. 69, 540 A.2d 932 (1988). Section 481(c) contains no such notice provision. Rather, its mandatory restitution provision must by its unqualified terms be deemed to be *automatically* applicable; there is no indication of any intent to vest discretion in the prosecutor to elect to waive its application. Hence, we do not find restitution to have been waived or waivable in the instant case.

## B. FORFEITURE OF RESTITUTION FOR CONTEMPT

■ The trial court's finding that the claims agent's failure to appear constituted a forfeiture of the right to restitution is not justifiable as a sanction for the claims agent's alleged non-compliance with the court's directive to appear. This is so because contempt was not established, and because the Commonwealth's right to restitution may not properly be forfeited as a sanction for contempt.

■ The trial court had reasonable grounds to conclude that the claims agent had information relevant to the disposition of sentencing issues. Consequently, the trial court acted within its authority in directing that the claims agent appear at sentencing. *Cf. Commonwealth v. Maguigan,*

511 Pa. 112, 121, 511 A.2d 1327, 1332 (1986); *In Matter of Shigon*, 462 Pa. 1, 329 A.2d 235 (1974); *see also* 42 Pa.C.S.A. §§ 5904(d), 5905. Furthermore, it is well-settled that a trial court may enforce its subpoenas by appropriate action including issuance of bench warrant and/or imposition of sanctions for contempt. *Commonwealth v. Maguigan, supra,* 511 A.2d at 1332 (collecting cases); *Commonwealth v. Marcone,* 487 Pa. 572, 410 A.2d 759 (1980); 42 Pa.C.S.A. §§ 5904(d), 5905.

▪ However, the current record does not establish that the claims agent was in contempt of the trial court's directive to appear. Though the trial court had authority to formally *subpoena* the claims agent, it instead opted to informally request the claims agent's presence through a directive to the prosecutor which was to be communicated to the claims agent by the prosecutor. While it appears from the record that the claims agent was informed by the prosecutor's office that his appearance was requested, the time, form, and content of that notice do not appear in the record. Likewise, while it appears that the prosecutor was not aware of any legitimate reason for the claims agent's failure to appear, no effort was made to contact the claims agent, and no opportunity was given to the claims agent to explain his failure to appear prior to the trial court's declaration of a forfeiture of restitution as a sanction for that failure to appear.

▪ The trial court's frustration at the Department of Welfare's apparent pattern of failing to ensure the appearance of claims agents at such hearings is understandable. Nonetheless, the procedural protections of the formal subpoena process and formal contempt proceedings are prerequisites to the legitimate exercise of the court's inherent contempt powers to sanction a witness' failure to appear. *Cf. Matter of Ring,* 492 Pa. 407, 424 A.2d 1255 (1981) (mere non-compliance does not establish contempt); *Neshaminy Water Res. v. Del-Aware Unlimited,* 332 Pa.Super. 461, 472, 481 A.2d 879, 884–85 (1984) (due process requires that person alleged to be in contempt of court order be given

notice and an opportunity to defend before imposition of sanctions); *see also* 42 Pa.C.S.A. § 4132(2) (summary contempt limited to, *inter alia,* disobedience or neglect of *"lawful process* of the court").

Assuming, *arguendo,* that contempt had been established, forfeiture of the Commonwealth's right to restitution was not an authorized sanction for contempt by a Commonwealth agent or employee. To the contrary, 42 Pa.C.S.A. § 4133 provides:

### § 4133. Commitment or fine for contempt

*Except as otherwise provided by statute,* the punishment of commitment for contempt provided in section 4132 (relating to attachment and summary punishment for contempts) shall extend only to contempts committed in open court. *All other contempts shall be punished by fine only.*

(as amended 1982). (Emphasis added). As forfeiture of restitution mandated by 62 Pa.C.A. § 481(c) is nowhere authorized by statute as a sanction for contempt, the imposition of such a sanction was *ultra vires.* Moreover, we note that our Supreme Court has explained in a similar context:

While a trial court must have authority to regulate attendance upon its schedule and concommitant authority to sanction a breach, *the sanction must be visited upon the offender and not upon the interests of public justice.* The failure of a party to observe the orders of a court may result in a loss to a party in a civil action, because there the loss falls upon private interests and those who invoke the power of a court must be obedient to its orders or lose its powers to serve their purposes. Criminal cases involve issues of public justice; issues that transcend the immediate parties. *In criminal cases, sanctions may be imposed upon individuals, including counsel for either side;* sanctions that vindicate the authority of the court to maintain its schedule and enforce its orders.

*Commonwealth v. Carson,* 510 Pa. 568, 571–72, 510 A.2d 1233, 1234 (1986). (Emphasis added).

 The reasoning of our Supreme Court in *Carson* and the mandate of the above statute require that any financial sanction, if appropriate for the claims agent's failure to appear, be visited upon the claims agent *directly in his individual capacity* and not upon the taxpayers of this Commonwealth via forfeiture of their collective right to restitution of the moneys fraudulently obtained by appellees. There is no reason why the claims agent's contempt, if any, should be made to inure to the benefit of the appellees. *Cf. Commonwealth v. Carson, supra*, 510 A.2d at 1235 (Papadakos, J., concurring). No Commonwealth employee is cloaked with an agency which would authorize wilful misconduct such as contempt of court; consequently, we see no reason why the sanctions for contempt by a Commonwealth employee should be imposed upon the Commonwealth, rather than directly upon the employee. *Cf.* 42 Pa.C.S.A. §§ 8542(a)(2), 8550 (a local agency may not be held liable for the wilful misconduct of its employee, and an employee of a local agency enjoys no official immunity from liability for injuries arising from wilful misconduct).

 Our findings, that contempt was not established and that forfeiture of restitution would not have been an authorized sanction had contempt been established, are not intended to minimize or excuse the claims agent's failure to appear as requested. The question of how restitution of funds illegally obtained through welfare fraud are to be recouped is an important and complicated consideration for a sentencing judge in sentencing defendants convicted of welfare fraud. This is especially true when the convict is poor. Ordinarily, the testimony of the claims agent or another appropriate Department of Public Welfare (DPW) agent will be necessary for the proper resolution of any unsettled or disputed restitution issues at sentencing. While a trial court should not have to subpoena DPW agents in such cases, it was nonetheless error in this case for the trial court to proceed with sentencing in the absence of a DPW agent or an adequate alternate source for the pertinent information needed. When, as here, a necessary party or witness in a criminal proceeding is absent, the

proper course is to hold proceedings in abeyance and secure the presence of the necessary party or witness by the lawful process of a subpoena and a bench warrant (if deemed appropriate). Such a subpoena could, of course, permit substitution of a properly prepared DPW agent for the claims agent assigned to the case in order to accomodate scheduling conflicts and other legitimate administrative concerns. However, a sentencing court should not proceed without the necessary information simply because a party or witness fails to appear at the hour appointed for a hearing.

## III. EVIDENCE OF RESTITUTION OWED

Finally, we note that we reject appellees' argument that the failure of the claims agent to appear resulted in a failure of proof as to the amount of restitution owed. Appellees ignore the fact that they entered guilty pleas to charges which specifically alleged receipt of three thousand four hundred and twelve dollars ($3,412.00) worth of fraudulently obtained general assistance and food stamps. Appellees also ignore the fact that acceptance of the guilty plea and imposition of second degree misdemeanor convictions necessarily implied a finding that between $1,000 and $1,499 had been obtained as to each count. *See* 62 Pa.S.A. § 481(b).[8] The trial court, therefore, could not find that no money had been fraudulently obtained. We note that the trial court did not find that *no money* had been fraudulently obtained, nor did the court indicate that the evidence of record was insufficient and provided the prosecutor who was present with an opportunity to supplement the record with further evidence of the amount of restitution owed. Rather, the trial court simply refused to impose restitution because the claims agent failed to appear as requested.

8. We note that although neither the Commonwealth nor the appellees has contested the entry of two second degree misdemeanor convictions, those convictions appear to be at a variance with the guilty pleas. The complaints had charged welfare fraud in the amount of $2,615.00 and $797.00 respectively, which would have properly given rise to a first degree misdemeanor conviction and a third degree misdemeanor conviction respectively as to each appellee. *See* 62 Pa.S.A. § 481(b).

■ Finally, the refusal to order restitution cannot be justified on the basis of a failure of proof as to the appellees' ability to pay. Because there is no time limit to the period of repayment, the mandate of *Bearden* that the convict not be imprisoned based solely upon his or her inability to pay, *does not limit the amount of restitution ordered* pursuant to 62 Pa.S.A. § 481(c). Rather, a convict's ability to pay *limits only the exercise of the court's discretion as to the terms of the repayment of the restitution ordered.* Moreover, the trial court apparently found sufficient ability to pay to impose separate obligations of seventy-five dollars ($75.00) a month upon each appellee towards payments of the fines imposed. We note that the obligation to make restitution payments takes precedence over the obligation to pay fines. 42 Pa.C.S.A. § 9726(c)(2); *cf.* "A Supplement to the Penal Laws of this State (1791)," *reprinted in* 3 *Sm.L.* 37 (1810) (restitution is to be made prior to the imposition of any forfeiture to the state).

## CONCLUSION

Based upon the foregoing, we conclude that the trial court was without authority to impose sentences which failed to require appellees to make restitution of any moneys fraudulently obtained. Judgments of sentence are therefore vacated, and the cases are remanded for resentencing consistent with this opinion.

Jurisdiction is relinquished.

TAMILIA, J., files a concurring statement.

TAMILIA, Judge, concurring:

I agree with the majority that this case should be remanded for resentencing with the trial court to be directed to enter an Order of restitution. Where I believe the trial court erred was in failing to compel the representative of the Department of Welfare to be present to give insight into the means and procedure for collecting the restitution and the policy of the Department as to restitution in given cases.

I do not agree with the majority that restitution is mandatory per se, but believe that despite the apparent mandatory nature of the language regarding restitution, failure to take into consideration the individual circumstances of each case can well result in confiscatory and excessively punitive measures which will deny the person and or his family the basic necessities of life. Experience shows that an excessive restitution Order does not result in payment but simply imposes greater burdens on the court and its staff to enforce the Order or requires imprisonment of the defendant for violation of the Order. For these and other reasons which could be expounded upon, I would hold that while the sense of the legislation is to make restitution mandatory, the form it takes is discretionary with the court. Having the representative of the Department of Welfare present to explain department policies and expectations would appear to be necessary for this purpose.

I do not fault the trial judge in refusing to make an Order of restitution if the Department fails to make available a representative. The trial judge has the duty to impose a sentence based on reason and proper consideration of needs and expectations of the parties. If the Department fails to cooperate in this determination, a proper sentence cannot be imposed.