566 A.2d 272

**COMMONWEALTH of Pennsylvania**

v.

**David SAVAGE, Appellant.**

Superior Court of Pennsylvania.

Argued Dec. 7, 1988.

Filed Nov. 8, 1989.

562

Joseph M. Devecka, State College, for appellant.

Brendan J. Vanston, Dist. Atty., Tunkhannock, for Com., appellee.

Before CIRILLO, President Judge, and BECK and KELLY, JJ.

KELLY, Judge.

This is an appeal from an order denying appellant's motion to dismiss a charge of criminal conspiracy to distribute cocaine. Appellant contends that the present conspiracy charge arises from the same conspiracy which was the basis for the federal conspiracy charge to which he has already entered a negotiated guilty plea, and therefore the present charge must be dismissed in accordance with 18 Pa.C.S.A. § 111. The Commonwealth responds that two separate cocaine distribution conspiracies are involved. We conclude that the Commonwealth failed to meet its burden of proof to establish separate conspiracies; consequently, we are constrained to reverse.

The relevant facts and procedural history may be summarized as follows. Pursuant to a lawfully obtained wiretap order issued by this Court, telephone calls to and from the residence shared by Mrs. Cindy Janoski and Mr. Robert Lipinski a/k/a Rod Sun, were monitored and recorded by narcotics agents of the Pennsylvania Attorney General's Region VIII Narcotics Strike Force. Calls to and from appellant, and subsequent surveillance of appellant established probable cause to arrest appellant on a charge of criminal conspiracy to deliver cocaine to Ms. Janoski and Mr. Lipinski. Ms. Janoski subsequently agreed to cooperate with the Commonwealth, and revealed that appellant had in fact delivered cocaine to her on April 29, 1987.

Appellant was arrested and charged with criminal conspiracy on August 3, 1987.

While the state charge was pending, appellant was arrested by federal authorities. The multicount indictment returned by a federal grand jury against appellant included a charge that appellant had conspired with Alexander Eugenio Moskovitz, Charles O'Rourke, Lola Fulin, and others known and unknown, to import, possess with intent to deliver, and deliver cocaine in Pennsylvania. Appellant elected to enter a negotiated guilty plea to the federal charge.

The factual basis for the plea presented at the plea hearing involved evidence which provided at least probable cause to believe the following. Between 1983 and 1987, Alexander Moskovitz controlled and directed a large scale criminal conspiracy which involved the importation of multikilogram amounts of cocaine from Columbia, South America to Miami, Florida, and then the transportation of the cocaine from Miami, Florida to Philadelphia, Pennsylvania for sale and distribution to wholesale and retail dealers in Pennsylvania. The volume of cocaine imported during the continuance of Moskovitz's importation and distribution conspiracy increased from approximately ten ounces (0.331 kilograms) to four kilograms *per month* during the last six months of the conspiracy.[1]

---

1. We note the following in order to provide perspective as to the probable street impact of Moskovitz's importation conspiracy.

An average line of powder cocaine for snorting, or dosage for freebase injection, requires 20 to 30 milligrams of cocaine. *See* Gold, *800-Cocaine,* at 5 (3rd ed., 1986); Berger, *Crack: The New Epidemic,* at 54 (1986). Ten ounces is thus equivalent to approximately 11,033 doses of cocaine; four kilograms is thus equivalent to 133,333 doses of cocaine. Moreover, while cocaine is imported in relatively pure form to reduce bulk in order to reduce risk of detection and increase profits; the drug generally reaches users at approximately 30% purity. *See* Reuter, *Quantity Illusions and Paradoxes of Drug Interdiction,* 51 L. & Cont. Prob. 233, 243 (1988) (providing national DEA price and purity approximates for 1987); *cf.* Report, *Operation Alliance: Drug Interdiction on the Southwest Border,* House Report No. 100–562, 100th Congress, 2nd Sess., at 82–83 (April 5, 1988) (remarks of DEA Special Agent Burke, giving prices and purity approximates for cocaine and crack in Arizona). Thus, ten ounces of base may yield as

Charles O'Rourke and Lola Fulin, named co-conspirators in the federal action, acted as "mules" for Moskovitz in his importation operation; that is to say, they carried money to Columbia on some trips and returned with cocaine on others. While the record in the federal case does not include the names of other "mules," it does suggest that the existence of such persons as unnamed unindicted co-conspirators. The record also suggests the existence of other unnamed unindicted co-conspirators acting (like appellant) as wholesalers and/or retailers of the cocaine imported by Moskovitz.

Appellant joined the already operating conspiracy in March, 1986 and continued to purchase cocaine from Moskovitz on a regular basis in amounts which increased from an initial four ounce purchase (113 gr.) to an eventual purchase amount of two kilograms.[2] There is no indication in the statement of the factual predicate for the federal charge as to whether Moskovitz was appellant's only source of cocaine, or whether appellant had other suppliers as well. It is clear, however, that appellant was not the only wholesaler or retailer of illegal cocaine to whom Moskovitz distributed the product of his importation operation. This is evident based upon the difference between Moskovitz's importation amounts and appellant's purchase amounts.

Appellant entered his negotiated guilty plea to the federal conspiracy charge on December 11, 1987. On April 20, 1988, appellant moved to have the pending state conspiracy charge dismissed based upon his contention that it was barred by 18 Pa.C.S.A. § 111. A hearing was held on the motion on June 17, 1988. On June 22, 1988, the motion was denied. This timely appeal followed.

many as 36,767 doses; and four kilograms of base may yield as many as 444,443 doses. These numbers of possible doses estimates are "normative" and admittedly rough.

2. Because the record does not disclose the purity of the cocaine purchased by appellant, we cannot accurately estimate the approximate street purity bulk of the cocaine purchased. Assuming, however, that the cocaine had already been fully cut to 30% street purity, four ounces could still represent as many as 3,766 doses and two kilograms could represent as many as 66,666 doses.

On appeal, appellant contends that the state and federal conspiracy charges arise from the same criminal conspiracy, and therefore the pending state charges are barred by 18 Pa.C.S.A. § 111, which provides in pertinent parts as follows:

§ 111. When prosecution barred by former prosecution in another jurisdiction

When conduct constitutes an offense within the concurrent jurisdiction of this Commonwealth and of the United States or another state, a prosecution in any such other jurisdiction is a bar to a subsequent prosecution in this Commonwealth under the following circumstances:

(1) The first prosecution resulted in an acquittal or in a conviction as defined in section 109 of this title (relating to when prosecution barred by former prosecution for the same offense) and the subsequent prosecution is based on the same conduct unless:

(i) the offense of which the defendant was formerly convicted or acquitted and the offense for which he is subsequently prosecuted each requires proof of a fact not required by the other and the law defining each of such offenses is intended to prevent a substantially different harm or evil; . . . .

18 Pa.C.S.A. § 111(1)(i). Appellant emphasizes that the state and federal conspiracy charges both alleged conspiracies to distribute cocaine in Pennsylvania during overlapping time periods. He suggests that while the named state co-conspirators are not named federal co-conspirators, the state co-conspirators should be considered to have been subsumed in the general category of unnamed co-conspirators included in the federal indictment. Appellant cites *Commonwealth v. Abbott*, 319 Pa.Super. 479, 466 A.2d 644 (1983) in support of his contentions.

The Commonwealth responds that while the state and federal conspiracies related to the same drug at roughly the same time, in the same general area, the conspiracies involved only one common participant, and were in fact wholly separate conspiracies. The Commonwealth cites *Com-*

*monwealth v. Abbott, supra,* in support of its response. The trial court, applying *Commonwealth v. Abbott, supra,* agreed with the Commonwealth that separate conspiracies were involved and denied the motion to dismiss. We reverse.

## I. *Jurisdiction*

It is well settled in Pennsylvania that a defendant is entitled to an immediate interlocutory appeal as of right from an order denying a non-frivolous motion to dismiss on state or federal double jeopardy grounds. *See Commonwealth v. Brady,* 510 Pa. 336, 508 A.2d 286 (1986). Appellant has presented a statutory claim under 18 Pa.C.S.A. § 111, which provides a qualified renunciation of authority to reprosecute under the "separate sovereigns" doctrine a defendant previously tried for the same crime in federal court. The reasoning which permits an interlocutory appeal from an order denying a non-frivolous motion to dismiss pursuant to either the state or federal double jeopardy clauses, applies equally to an order which denies a non-frivolous motion to dismiss pursuant to 18 Pa.C.S.A. § 111. The trial court did not find appellant's Section 111 claim to be frivolous; hence, we conclude that appellant's interlocutory appeal is properly before this Court.

## II. *Conspiracy Generally*

The common law of conspiracy was cogently summarized by Justice Powell in *Iannelli v. United States,* 420 U.S. 770, 95 S.Ct. 1284, 43 L.Ed.2d 616 (1975), as follows:

Conspiracy is an inchoate offense, the essence of which is an agreement to commit an unlawful act. Unlike some crimes that arise in a single transaction, the conspiracy to commit an offense and the subsequent commission of that crime do not merge into a single punishable act. Thus, it is well recognized that in most cases separate sentences can be imposed for the conspiracy to do an act and for the subsequent accomplishment of that end. Indeed, the Court has even held that the conspiracy can be punished

even more harshly than the accomplishment of its purpose.

The consistent rationale of this long line of decisions rests on the very nature of the crime of conspiracy. This Court repeatedly has recognized that a conspiracy poses distinct dangers quite apart from those of the substantive offense.

"This settled principle derives from the reason of things in dealing with socially reprehensible conduct: collective criminal agreement—partnership in crime—presents a greater potential threat to the public than individual delicts. Concerted action both increases the likelihood that the criminal object will be successfully attained and decreases the probability that the individuals involved will depart from their path of criminality. Group association for criminal purposes often, if not normally, makes possible the attainment of ends more complex than those which one criminal would accomplish. Nor is the danger of a conspiratorial group limited to the particular end toward which it has embarked. Combination in crime makes more likely the commission of crimes unrelated to the original purpose for which the group was formed. In sum, the danger which a conspiracy generates is not confined to the substantive offense which is the immediate aim of the enterprise."

As Mr. Justice Jackson, no friend of the law of conspiracy, observed: "The basic rationale of the law of conspiracy is that a conspiracy may be an evil in itself, independently of any other evil it seeks to accomplish."

420 U.S. at 777–79, 95 S.Ct. at 1290, 43 L.Ed.2d at 622–24 (citations and footnotes omitted); *see generally* Marcus, *Prosecution and Defense of Criminal Conspiracy Cases,* §§ 1.01–1.06 (1989 & 1989 Supp.) (summarizing the development of conspiracy law from early English cases forward); Pollack, *Common Law Conspiracy,* 35 Geo.L.Rev. 328, 328–52 (1947) (same); Sayre, *Criminal Conspiracy,* 35 Harv.L.Rev. 393, 393–427 (1922) (same).

 The common law of criminal conspiracy has been codified in Pennsylvania at 18 Pa.C.S.A. § 903. A perusal of that statute plainly reveals that agreement of two or more persons to act in concert for a criminal purpose remains the evil against which the criminal conspiracy statute is directed. *See Commonwealth v. Derr*, 501 Pa. 446, 462 A.2d 208 (1983); 18 Pa.C.S.A. § 903(a). While the Commonwealth is not required to prove a written or express agreement, a tacit agreement must be established by reasonable inferences arising from the facts and circumstances and not by mere suspicion or conjecture. *See Commonwealth v. Monroe*, 356 Pa.Super 109, 514 A.2d 167 (1986); *Commonwealth v. Lore*, 338 Pa.Super 42, 487 A.2d 841 (1984).

## III. *Single or Multiple Conspiracies*

For the limited purpose of this appeal, there is no dispute as to the existence of conspiratorial agreements between Ms. Janoski, Mr. Lipinski and appellant, or between Ms. Fulin, Mr. O'Rourke, Mr. Moskovitz and appellant. Rather, the critical question in this appeal is whether there were *two separate conspiracies* or a *single multi-faceted conspiracy*. This important distinction often is not an easy one to make.

 Under Pennsylvania law, a single conspiracy may have multiple criminal objectives. *See* 18 Pa.C.S.A. § 903(c). Thus, when on a single occasion there is a single agreement to commit two crimes, *e.g.* murder and arson, a single conspiracy exists. *See Commonwealth v. Grove*, 363 Pa.Super. 328, 347, 526 A.2d 369, 379 (1987). Likewise, a single conspiratorial agreement may involve a continuing course of criminal conduct involving the repetition of a single crime or the commission of a series of crimes. *See Commonwealth v. Perez*, 381 Pa.Super 149, 151, 553 A.2d 79, 79–80 (1988) (finding a single conspiracy to commit multiple violations of separate statutes against the distribution of marijuana and the distribution of cocaine).

Nonetheless, the essence of conspiracy remains the agreement to work in concert for one or more criminal purposes. Just as a single entrepreneur may enter into several separate yet similar joint business ventures with the same or different partners or investors at the same time, criminals in general and drug traffickers in particular may enter into more than one criminal conspiracy involving similar crimes at the same time, even in the same area. *See generally* Reuter, "A Portfolio of Major Drug Traffickers," *in Organized Crime Narcotics Enforcement Symposium*, at 75–79 (Pa. Crime Comm.1988) (describing the variability of partnerships, associations, and source connections of high level drug dealers); Alder & Alder, *Relationships Between Dealers: The Social Organization of Illicit Drug Transactions*, 68 Soc. & Soc.Res. 260, 260–78 (1983) (same); Alder & Alder, *Shifts and Oscillations in Deviant Careers: The Case of Upper–Level Drug Dealers and Smugglers*, 31 Social Problems 195, 195–207 (1983) (same); Soref, *The Structure of Illegal Drug Markets: An Organizational Approach*, 10 Urban Life, 329, 329–52 (1981) (same).

Distinguishing between a single continuing criminal conspiracy and multiple separate or continuing criminal conspiracies is further complicated by the fact that it is not necessary that each conspirator know the identity of each fellow conspirator so long as the conspirator knows that a person with whom he has conspired has in turn conspired with other unknown persons to aid in the attainment of their joint conspiratorial objective(s). *See* 18 Pa.C.S.A. § 903(b). While we are aware of no Pennsylvania appellate court decisions specifically applying or construing that provision, we note that the equivalent federal provision has been consistently construed to provide that individual members of conspiracies need not know of all the co-conspirators, conspiratorial objectives, or steps to be taken in furtherance of the conspiracy, so long as the co-conspirators are aware of the existence of the broader conspiracy and its general objectives, and the co-conspirator acts (or agrees to act) in furtherance of the conspiracy. *See e.g. United*

*States v. Adamo,* 882 F.2d 1218, 1222–24 (7th Cir.1989); *United States v. Sanchez Solis,* 882 F.2d 693, 696 (2d Cir.1989); *United States v. Roberts,* 881 F.2d 95, 101 (4th Cir.1989); *United States v. Martinez,* 877 F.2d 1480, 1482 (10th Cir.1989); *United States v. Mendoza,* 876 F.2d 639, 642–43 (8th Cir.1989); *United States v. Garcia–Rosa,* 876 F.2d 209, 223 (1st Cir.1989); *United States v. Rastelli,* 870 F.2d 822, 827–28 (2nd Cir.1989); *United States v. Garbett,* 867 F.2d 1132, 1135 (8th Cir.1989); *United States v. Nusraty,* 867 F.2d 759, 763 (2nd Cir.1989); *United States v. Grier,* 866 F.2d 908, 924 (7th Cir.1989); *United States v. Inadi,* 748 F.2d 812, 817 (3rd Cir.1984) *rev'd on other grounds* 475 U.S. 387, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986) (reversing the 3rd Circuit's reversal of Inadi's convictions on other grounds); *United States v. Warner,* 690 F.2d 545, 548–49 (6th Cir.1982).

In this case, reliance by the Commonwealth and appellant as well as the trial court, on our decision in *Commonwealth v. Abbott, supra,* was in some respects unfortunate. Though *Abbott* is indeed an important case to consider in analyzing 18 Pa.C.S.A. § 111 motions, fundamental differerces between the facts of *Abbott* and the facts of this case mandate different analysis in resolving the key issues presented here.

*Abbott,* though decided under Section 111, presented facts virtually indistinguishable from those involved in the Section 110 issue addressed in *Commonwealth v. Hude,* 500 Pa. 482, 458 A.2d 177 (1983). In both *Abbott* and *Hude* the primary focus was on whether a series of similar criminal acts were part of one "episode." Here, the principle issue is whether one or two groups of conspirators were involved; and, if two separate groups were involved, whether the separate groups of conspirators nonetheless furthered a single broader conspiracy. In *Abbott,* on the other hand, there was no conspiracy at all; rather, there was a series of illegal drug sales by one Doctor of Osteopathy to several different undercover agents during a single six month investigation. The critical issue here, *i.e.* whether the facts

reveal the existence of a single group of conspirators, multiple groups of conspirators pursuing a single conspiracy, or multiple groups of conspirators pursuing separate conspiracies, was neither presented nor considered in *Abbott.* The decision in *Commonwealth v. Mascaro,* 260 Pa.Super. 420, 394 A.2d 998 (1978), is similarly distinguishable.

Our decision in *Commonwealth v. Perez, supra,* is of only slightly greater applicability. In *Perez,* this Court held that multiple conspiracy convictions arising from a series of cocaine and marijuana sales could not be sustained because:

> Nothing in the complaint tends to establish separate conspiracies to distribute cocaine and marijuana or tends to disprove that a single conspiratorial relationship existed from which both marijuana and cocaine were distributed to the Walters in Pennsylvania.

553 A.2d at 81. We noted that "[a]ppellant [was] depicted as doing no more than supplying, along with the other three Miami residents, cocaine and marijuana to Walters, who in turn sold drugs to others." *Id. Perez* emphasizes the need to establish specific facts demonstrating the separateness of conspiracies to justify separate conspiracy convictions. Unfortunately, *Perez* does not indicate the type of facts which would establish the existence of *separate* conspiracies.

The dearth of Pennsylvania case law on this subject stands in stark contrast to the abundance of federal case law. While not *controlling* as to the proper construction of either 18 Pa.C.S.A. § 111 or 18 Pa.C.S.A. § 903, we nonetheless find the multifactor totality of the circumstances analysis embraced by a majority of the federal circuit courts for distinguishing single from multiple conspiracies to be a generally appropriate approach. *See United States v. Liotard,* 817 F.2d 1074, 1078 & n. 7 (3rd Cir.1987) (collecting cases); *see also United States v. Lindell,* 881 F.2d 1313, 1318 (5th Cir.1989); *United States v. Peveto,* 881 F.2d 844, 854–55 (10th Cir.1989); *United States v. Sanchez-Lopez,* 879 F.2d 541, 549 (9th Cir.1989); *United States v.*

*Gunter,* 876 F.2d 1113, 1120 (5th Cir.1989); *United States v. Mendoza, supra,* 876 F.2d at 642–43; *United States v. Garcia–Rosa, supra,* 876 F.2d at 223; *United States v. DeVarona,* 872 F.2d 114, 118 (5th Cir.1989); Note, *"Single vs. Multiple" Criminal Conspiracies,* 65 Minn.L.Rev. 295, 310–11 & nn. 78–84 (1980) (collecting cases).

■ The factors most commonly considered in a totality of the circumstances analysis of the single *vs.* multiple conspiracies issue in the cases noted above are: the number of overt acts in common; the overlap in personnel; the time period during which the alleged acts took place; the similarity in methods of operation; the locations in which the alleged acts took place; the extent to which the purported conspiracies share a common objective; and, the degree to which interdependence is needed for the overall operation to succeed. *See* Note, *supra,* 65 Minn.L.Rev. at 310–11 & nn.78–84 (collecting cases). We find all of these factors to be appropriate to consider in distinguishing single from multiple conspiracies.

Different circuit courts have adopted different constructions or expressions of the multifactor test to be applied in such cases. *Compare United States v. Goff,* 847 F.2d 149, 166 (5th Cir 1988) (applying the five factor *Marable* test) [3] *and United States v. Liotard, supra,* 817 F.2d at 1078 (announcing a similar four factor test and criticizing particular aspects of the *Marable* test). To the extent that the tests as stated and applied in the various circuit courts actually differ, we find it unnecessary to choose between the tests. Rather, we consider the tests to be merely illustrative of the type of considerations to be included in the totality of circumstances analysis to be conducted, and not formulaic expressions of rigid tests to be applied.

■ Indeed, we emphasize that no one factor or combination of factors is necessarily dispositive. "A single conspiracy is not transposed into a multiple one simply by lapse of time, change in membership, or a shifting in emphasis in the

3. *See United States v. Marable,* 578 F.2d 151, 154 (5th Cir.1978).

location of the operation." *United States v. DeVarona,*
*supra,* 872 F.2d at 119, *quoting United States v. Vila,* 599
F.2d 21, 24 (2nd Cir.), *cert. denied* 444 U.S. 837, 100 S.Ct.
73, 62 L.Ed.2d 48 (1979); *see also United States v. Napue,*
834 F.2d 1311, 1333 (7th Cir.1987). All relevant factors
must be considered.

Conspiracies are sometimes diagrammed and described in
terms of chains, links, spokes, wheels, and forks. *See
generally* Marcus, *Prosecution and Defense of Criminal
Conspiracy Cases, supra,* at § 4.02(2) (collecting and ana-
lyzing cases); Flannery, *Conspiracy: A Primer,* The
Champion at 4, 10–13 (Nat'l Crim. Def. L. Ass'n. December
1988). For *descriptive* purposes such analogies can at
times be extremely useful.

As an aid or gauge of analysis of the "single vs. multiple
conspiracies" issue, however, the efficacy of such analogies
is extremely doubtful. Judge Friendly has opined that for
analytical purposes, such analogies "obscure as much as
they clarify." *United States v. Borelli,* 336 F.2d 376, 383
(2nd Cir.1964). In *United States v. Perez,* 489 F.2d 51 (5th
Cir.1973), after an extended demonstration of the futility of
attempting to fit the facts of *Perez* into one such analogy
and thereby distinguish it from the others in order to
determine whether a single conspiracy or multiple conspira-
cies existed, Chief Circuit Judge John R. Brown explained in
apparent exasperation:

> As for us, the problem is difficult enough without trying
> to compress it into figurative analogies. Conspiracies are
> as complex as the versatility of human nature and federal
> protection against them is not to be measured by spokes,
> hubs, wheels, rims, chains, or any one or all of today's
> galaxy of mechanical, molecular or atomic forms.

489 F.2d at 59 n. 11; *accord United States v. DeVarona,*
*supra,* 872 F.2d at 118 ("in analyzing whether the nature of
a scheme points to a single conspiracy [or multiple conspira-
cies], this court has avoided analogies to wheels, rims, hubs,
and chains").

■ We agree that the use of such analogies should be confined to *descriptive* rather than *analytical* purposes. Whether a single conspiracy or multiple conspiracies exist must be determined by a multifactor analysis of the totality of the circumstances. Analysis must precede labelling. Most importantly, the principal focus must remain on the *existence* and *scope* of the conspiratorial agreement, which is the *sine qua non* of the offense. *Cf. Commonwealth v. Derr, supra.*

■ Finally, with regard to continuing criminal conspiracies, we note that whether a given accused's acts indicate knowing participation in a broad continuing conspiracy, or are merely acts which *incidentally* benefit the broad conspiracy may depend upon the role which the accused played in the acts involved. For example, a purchaser of drugs for personal use is generally not deemed a participant in a broad drug distribution conspiracy solely on the basis of one or more "personal use" purchases. *See United States v. Brown,* 872 F.2d 385, 390–91 (11th Cir. 1989); *United States v. Zabare,* 871 F.2d 282, 287 (2nd Cir.1989); *United States v. DeLutis,* 722 F.2d 902, 905–07 (1st Cir.1983). In *Zabare,* Circuit Judge Lawrence Pierce explained:

> While it is true that a purchaser of illicit drugs or stolen goods may advance the goals of a criminal conspiracy simply by virtue of the revenues his purchase generates, the single purchase alone is not *per se* evidence the buyer's intent to knowingly join and participate in that conspiracy.
>
> \* \* \* \* \* \*
>
> ... it is also settled in this Circuit that a defendant's participation in a single transaction can suffice to sustain a charge of knowing participation in an existing conspiracy. The test that has evolved for determining whether a single act is sufficient to support a conspiracy conviction is whether " 'the qualitative nature' of the act 'viewed in the context of the entire conspiracy' ... in a particular

case" supports beyond a reasonable doubt the inference "that an individual is involved in a conspiracy."

871 F.2d at 287 (citations omitted). Though discussed as a "single transaction" rule in *Zabare,* the rule involved is in fact more properly characterized as a "purchase for personal use" rule as it is generally applied to narcotics cases. *See United States v. Brown, supra* (a drug user made *several* purchases for personal use over a period of time from a single source, yet did not thereby become a participant in the source's broader conspiracy).[4]

**4.** It is unquestionably true that without drug purchasers the entire insidious drug trafficking network of growers, manufacturers, mules, importers, wholesalers and retailers would collapse. Michael Levine, a federal undercover narcotics agent, who for more than two decades put his life on the line in America's War on Drugs, has explained passionately to audiences of ostensibly law abiding adults:

... you know what the real tragedy is? The tragedy is you got the cure in your own hands. It's simple. Just stop buying the [drugs]. That's all. If half of you do that, and the other half stop pretending this has got nothing to do with them, the disease will go away. The siege will be over. Stop buying it, and our children and our cities will be safe again. Stop buying the [drugs] and you'll pump billions and billions of dollars back into the economy. Stop buying it, and you'll put me out of a job.

Goddard, *Undercover: The Secret Lives of A Federal Agent,* at 282 (1988) (quoting Agent Levine). It has also been cogently, though regretfully, observed that:

Few users stop to think that they are at the end of a long chain of events that starts in the highlands of South America, where the coca plant is grown. The road from there to the streets of our cities is paved with corruption, violence, and organized crime. Not only do users pay the price with their lives, they also threaten the welfare and well-being of the rest of society.

Berger, *Crack: The New Drug Epidemic,* at 64 (1987).

The former neglect of the otherwise law-abiding casual user's role has all but ended. Effective education as to the personal and communal consequences of such drug use, combined with renewed and invigorated enforcement of real sanctions for simple possession of illegal drugs for personal use reflect a productive new and heightened appreciation of the significance of even the otherwise law-abiding casual drug user's role in maintaining the violent and destructive system of illegal drug trafficking. *See generally* Bennett, *National Drug Control Strategy,* at 24–26 and 125–27 (ONDCP 1989), *excerpts reprinted in* 3 NCTAP News 1–8 (October 1989); Greve & Purdy, "Bush Outlines Drug Battle Plan: Going After Casual Users a Priority," *Wall Street Journal,* at 1 A (Sept. 6, 1989); Meese, "Cocaine Addiction Rising As Recreational Use Dips," *Philadelphia Daily News,* at 44 (August 1, 1989); Squires, "Getting 'Unhooked,' High School Seniors

■■■ On the other hand, a single purchase of drugs *for resale* from an importer or wholesaler may, under the totality of circumstances, demonstrate sufficient participation to make the retailer a member in the broader conspiracy of the wholesaler or importer. *See United States v. Garcia–Rosa, supra,* 876 F.2d at 223 (noting the acceptance of the "isolated transaction" doctrine in the First Circuit, but finding it inapplicable to the defendant's *multiple bulk* purchases). If a retailer knew, *or has reason to know,* that other retailers were involved with the organization in a broad project for trafficking in illegal narcotics, *and* had reason to believe that his or her own benefits derived from the operation were probably dependent on the success of the entire venture, then a jury could properly find that each had agreed to the overall scheme. *United States v. Grier, supra,* 866 F.2d at 924; *accord United States v. Adamo, supra,* 882 F.2d at 1224–25; *United States v. Garcia–Rosa, supra; United States v. Baxter,* 492 F.2d 150, 158 (9th Cir.1973). Even if the separate retailers purchasing from the same source were considered independent of each other, and *vis a vis* other retailers were deemed to be members of different lesser conspiracies, the retailer might still be bound as a co-conspirator vertically to all those in the broader drug trafficking network performing separate, necessary tasks in furtherance of the common scheme which results in delivery of illegal drugs to the retailer for resale. *Cf. United States v. Lindell, supra,* 881 F.2d at 1318.

Report Declining Use of Drugs," *Washington Post,* at Z 28 (March 7, 1989).

Nonetheless, we agree with the federal courts which have previously addressed this issue, that a purchaser for personal use is not properly categorized as a co-conspirator in the broader drug trafficking network based solely upon one or more purchase of drugs for personal use. *Cf. United States v. Brown, supra; United States v. Zabare, supra.* Rather, penalties for simple possession must be deemed to reflect our legislature's assessment of the appropriate sanctions for this level of involvement, with all its ramifications. *Cf.* Bennett, *supra,* at 24–26 and 125–27 (recommending a variety of sanctions for otherwise law abiding casual users).

## IV. *Allocation of the Burden of Proof*

In *Commonwealth v. Mascaro, supra,* this Court held:

We find that the Commonwealth has failed to sustain its burden of proving both that the federal charges, to which a guilty plea was entered and accepted, failed to adequately protect its interests, and that the federal conviction was based on substantially different evidence than was required to convict in the state court.

394 A.2d at 1002. This excerpt from *Mascaro* was quoted with approval in *Commonwealth v. Abbott, supra,* 466 A.2d at 651. Thus, in both cases this Court placed the burden of proof as to the merit of the defendant's non-frivolous pretrial 18 Pa.C.S.A. § 111 claim on the Commonwealth. In neither case, however, was the basis for the allocation of the burden of proof explained or the standard of proof specified (*i.e.* preponderance, clear and convincing evidence, or beyond a reasonable doubt). These important questions have been addressed in the federal courts and some of the courts of our sister states. We shall briefly review those authorities before addressing the silences of the *Mascaro* and *Abbott* decisions on these important issues.

A clear majority of federal circuit courts have held that once a defendant makes a *prima facie* non-frivolous double jeopardy claim, the burden of *proof* shifts to the prosecution to prove by a preponderance of the evidence that the indictments charge separate offenses. *See United States v. Goff, supra,* 847 F.2d at 169 (5th Cir.1988); *United States v. Ragins,* 840 F.2d 1184, 1192 (4th Cir.1988); *United States v. Liotard, supra,* 817 F.2d at 1077 (3rd Cir.1987); *United States v. DelVecchio,* 800 F.2d 21, 22 (2nd Cir.1986); *United States v. Loyd,* 743 F.2d 1555, 1552–63 (11th Cir.1984); *United States v. Booth,* 673 F.2d 27, 30 (1st Cir.1982); *United States v. Jabara,* 644 F.2d 574, 576–77 (6th Cir. 1981); *United States v. Tercero,* 580 F.2d 312, 315 n. 12 (8th Cir.1978); *accord* Note, *The Burden of Proof in Dou-*

*ble Jeopardy Claims,* 82 Mich.L.Rev. 365, 368–69 (1983).[5] The rationale for shifting the burden of *proof* to the prosecution was summarized in *United States v. Ragins, supra,* as follows:

When a double jeopardy claim is raised before commencement of the second trial, however, a defendant is at a serious disadvantage in attempting to prove the identity of the successive offense charged to him. There is as yet no record from the second trial, and the rules of criminal procedure give the defendant little opportunity to discover the proof on which the government intends to rely in that trial. He must therefore rely on the indictments themselves, his own testimony, and any testimony he can obtain from his co-defendants and other third parties. But the government controls the precision with which the second offense is charged, the defendant's own testimony is unlikely to carry much weight, and he is unable to offer his co-defendants immunity for their testimony. Unless the prosecution is utterly inept in drafting the two indictments, then, it will often be impossible for the defendant to carry the burden of proving that the two offenses charged against him are in reality one and the same. Until the Supreme Court held in *Abney v. United States,* 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977), that the denial of a motion to dismiss an indictment on double jeopardy grounds was appealable interlocutorily, the appellate courts seldom had occasion to confront this problem. In the years since *Abney,* however, eight of the federal circuits—indeed, every circuit that has addressed the issue—have held that when a defendant puts double jeopardy in issue with a non-frivolous showing that an indictment charges him with an offense for which he was

**5.** It appears that the Seventh Circuit *may* embrace this view as well. *See United States v. Verrusio,* 803 F.2d 885, 895 & n. 17 (7th Cir.1986) (*dicta,* casting doubt on prior contrary decisions and embracing the majority view in an *analogous* setting). *But see United States v. Roman,* 728 F.2d 846, 854 (7th Cir.1984) (burden of proof is on the defendant); *United States v. Castro,* 629 F.2d 456, 461 (7th Cir.1980) (same); *United States v. Crumpler,* 636 F.Supp. 396, 403 (N.D.Ind. 1986) (stating that *unlike* other circuits, the Seventh Circuit *does not* shift the burden of proof to the prosecution).

formerly placed in jeopardy, the burden shifts to the government to establish that there were in fact two separate offenses.

840 F.2d at 1191–92 (also collecting cases); *accord* Note, *supra,* 82 Mich.L.Rev. at 365–86.[6]

The assertion of unanimity in *Ragins* as to the proper allocation of the burden of proof, however, was not entirely accurate. Both the Ninth Circuit and the Tenth Circuit had indicated by then a *different* allocation of the burden of proof.

Several decisions of the Tenth Circuit have indicated adherence to the pre–*Abney* allocation of the burden of proof upon the defendant. *See United States v. Thompson,* 814 F.2d 1472, 1476 (10th Cir.1987); *United States v. Puckett,* 692 F.2d 663, 668 (10th Cir.1982) (collecting 10th Cir. cases). There has been *dicta,* however, indicating the possibility of reconsideration of that allocation and adoption of the majority view. *See United States v. Jones,* 816 F.2d 1483, 1486 n. 1 (10th Cir.1987); *United States v. Beachner Constr. Co.,* 729 F.2d 1278, 1283 & n. 10 (10th Cir.1984). Neither *Thompson* nor *Puckett* discuss the majority view or its rationale; neither *Jones* nor *Beachner Constr. Co.* discuss the view of *Thompson* or *Puckett.*

The Ninth Circuit has carved out for itself a middle ground position which provides that a burden of *production* shifts to the prosecution when a *prima facie* non-frivolous double jeopardy claim is raised, but that the burden of *proof* remains with the defendant. In *United States v. Bendis,* 681 F.2d 561 (9th Cir.1981), the court explained:

This circuit has held that it is appellant's burden to establish that two conspiracies charged are the same. *See Sanchez v. United States,* 341 F.2d 225, 227 (9th Cir.)

---

6. We note that the risk to defendant's rights described in the justification stated above is limited to the risk of improper *retrial,* and does not involve the risk of improper *conviction.* If evidence was developed at trial which supported a former jeopardy claim which had been dismissed in the pre-trial stage, the defendant could renew the motion to dismiss on those grounds in post-verdict proceedings. *See United States v. Stricklin,* 591 F.2d 1112, 1119 (5th Cir.1979).

cert. denied, 382 U.S. 856, 86 S.Ct. 109, 15 L.Ed.2d 94 (1965). But the nature of the appellant's burden is necessarily different in this interlocutory appeal. The second trial has not yet occurred and the government is in the better position to know what it expects to prove at that trial. *Sanchez* did not have to consider this problem because it arose after the second trial was completed. The Second, Third and Fifth Circuits hold that in an *Abney* appeal such as this, when a defendant puts double jeopardy in issue with a non-frivolous showing that an indictment charges the same offense as that for which he was formerly placed in jeopardy, the "burden of proof" or "burden of persuasion" is on the government to establish by a preponderance of the evidence separate conspiracies. As an evidentiary concept, the burden of persuasion generally does not shift and would appear to rest always with the defendant on a double jeopardy claim. *See* J. Wigmore, *Evidence*, § 2489, p. 285 (3d ed 1940); *Sanchez v. United States, supra,* 341 F.2d at 227 (burden is on defendant to establish double jeopardy). But we agree with the principle in these cases that once the defendant makes a non-frivolous showing of former jeopardy, the government must tender to the court evidence indicating that separate conspiracies are charged. While this appears more properly characterized as a burden to go forward with the evidence, it may in practical effect amount to a burden to persuade the court. In this case, the government assumed its burden to go forward.

681 F.2d at 564; *see also United States v. Flick,* 716 F.2d 735, 737–38 (9th Cir.1983) (following *Bendis* ).[7] Though the Ninth Circuit suggests that a burden of production may *in practical effect* amount to a burden to persuade in some cases, the question of whether single or multiple conspiracies are involved may nonetheless remain unclear after complete production by the prosecution is made. In such cases the allocation of the burden of proof will decide the

---

7. This approach is similar to that adopted with regard to civil discrimination claims. *Cf. Wards Cove Packing Co. v. Atonio,* 490 U.S. ——, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989).

merit of the former jeopardy plea in favor of the prosecution, rather than the defendant as would occur under the majority view where a burden of *proof* rather than *production* shifts.

Few courts of our sister states have addressed the allocation of the burdens of proof and/or production regarding former jeopardy claims since the *Abney* decision in 1977. All of those which we discovered have rejected the view of the majority of federal courts, and have retained the burden of *proof* on the defendant throughout. *See Thomas v. State,* 751 S.W.2d 601, 603 (Tex.App.1988) (constitutional claim); *Hayles v. State,* 188 Ga.App. 281, 372 S.E.2d 668, 669 (1988) (statutory claim); *State v. Fowler,* 182 Ga.App. 897, 357 S.E.2d 329, 330 (1987) (common law/constitutional claim); *People v. Brown,* 195 Cal.App.3d 1252, 241 Cal.Rptr. 345, 347 (1987) (statutory claim); *State v. Mughni,* 33 Ohio St.3d 65, 514 N.E.2d 870, 872 (1987) (statutory claim); *Koon v. State,* 463 So.2d 201, 203 (Fla.1985); (constitutional claim); *Commonwealth v. Gonzalez,* 388 Mass. 865, 448 N.E.2d 759, 762 (1983) (constitutional claim); *People v. Ferguson,* 129 Cal.App.3d 1014, 181 Cal.Rptr. 593, 597–98 (1982) (constitutional claim); *Lutes v. State,* 272 Ind. 699, 401 N.E.2d 671, 672–73 (1980) (constitutional claim); *State v. Heinz,* 119 N.H. 717, 407 A.2d 814, 816 (1979) (constitutional claim). *But see State v. Lee,* 210 Kan. 753, 504 P.2d 202, 205 (1972) (stating the view *subsequently* adopted by the federal courts, *prior* to *Abney* ).

In the instant case, we must analyze the allocation of the burden of proof with respect to 18 Pa.C.S.A. § 111. In such analysis, reference to federal and state decisions regarding *constitutional* double jeopardy claims or claims brought under *differently worded* former jeopardy* *statutes* can have only limited *persuasive* authority. Nonetheless, they plainly demonstrate the existence of at least three different potential allocations of the burdens of production and proof used and approved in other jurisdictions.

Ultimately, we are faced with a question of statutory construction. Upon which party did our legislature place the burden of proof as to 18 Pa.C.S.A. § 111 claims?

While the structure of the statute indicates that the legislature intended that the Commonwealth bear the burden to establish *an exception* to the prohibition on a second prosecution for the "same conduct," by characterizing the ban as comprehensive and the instances where a second trial on charges relating to the "same conduct" may be had as *exceptions* (prosecution is barred "unless"),[8] the statute is absolutely silent as to who the legislature intended to bear the initial burden as to whether the second charge involved the "same conduct." In *Abbott* and *Mascaro* this Court held, without explanation, that the burden of proof was placed upon the Commonwealth. In accordance with principles of *stare decisis*, we are bound by those decisions and have no occasion to disturb or reconsider their allocation of the burden of proof. We note that the allocation of the burden in *Mascaro* and *Abbott* is consistent with the majority approach of the federal courts, and that more than a decade has passed since the *Mascaro* decision without any indication by our legislature that a contrary allocation of the burden was intended.

The language of 18 Pa.C.S.A. § 111 also provides no indication whatsoever as to the *standard of proof* the legislature intended to have applied. *Mascaro* and *Abbott* are silent on this issue. Consequently, we turn to the persuasive authority of the decisions of the federal courts which, like this Court in *Mascaro* and *Abbott*, have shifted the burden of proof to the prosecution. Those courts have reasoned that because a plea in bar grounded on former jeopardy addresses a personal privilege, rather than an element of an offense, the preponderance of the evidence standard, rather than a higher burden of proof, is appropriate in such cases. *See e.g. United States v. Ragins, supra*, 840 F.2d at 1192, *citing Lego v. Twomey*, 404 U.S. 477, 92

---

**8.** Similar, reasoning led to the conclusion that characterization of the plea of former jeopardy as a defense indicated an intent by the legislatures in Ohio and California to place the burden of proof on the defense. *See People v. Brown, supra; State v. Mughni, supra*.

S.Ct. 619, 30 L.Ed.2d 618 (1972) (the voluntariness of a confession may be established by a preponderance). Given the absence of a directive to the contrary by our legislature, we find this reasoning to be persuasive as to the standard of proof which should apply regarding the Commonwealth's burden to establish that the charges do not involve the "same conduct" when a defendent has raised a nonfrivolous 18 Pa.C.S.A. § 111 claim. What applies to *constitutional* privilege claims in this context logically applies with even greater force to *statutory* privilege claims. Hence, we conclude that when a defendant raises a non-frivolous *prima facie* claim that a prosecution may be barred under 18 Pa.C.S.A. § 111, the prosecution bears a burden to prove *by a preponderance of the evidence* either that the "same conduct" is not involved, or that a *statutory exception* to the *statutory bar* on reprosecution applies.

Here, that burden effectively entailed a burden to establish by a preponderance of the evidence that two *separate* drug trafficking conspiracies were involved. If separate conspiracies were involved, then the "same conduct" would not be involved within the meaning of the statute, and the former jeopardy bar of Section 111 would simply not apply. On the other hand, if the *same* conspiracy was involved in both conspiracy charges, then "substantially different interests" would not be involved within the meaning of Section 111. The evil against which *conspiracy* statutes are directed is the illegal agreement or combination for criminal purposes. Separate underlying predicate acts are merely circumstantial proof of the agreement.[9] The evil against which such charges would be directed then (*i.e.* the conspiratorial agreement), would logically remain at least "substantially the same," regardless of any disparities

9. It is important to note that the underlying criminal acts committed by members of a criminal conspiracy are separately chargeable offenses. Whether or not particular criminal offenses may be prosecuted following a prior conspiracy trial in another jurisdiction presents Section 111 former jeopardy issues distinct from those presented here, which we do not address.

which might exist as to predicate acts in furtherance of the agreement which might be alleged or which might be required to be proved to establish the separate conspiracy charges based upon the peculiar wording of the particular conspiracy statutes involved. *Both* a requirement of proof of different facts *and* the existence of substantially different interests to be protected are required to meet the statutory exception to the general bar on reprosecution set forth in 18 Pa.C.S.A. § 111(1)(i).

## V. *Analysis of the Facts of This Case*

■ We now proceed to analysis of the facts of this case, in light of the foregoing, to determine if 18 Pa.C.S.A. § 111 barred reprosecution of appellant in this case. We find that it did.

The relevant overt acts in the federal conspiracy were a series of bulk purchases of cocaine for resale, by appellant from Moskovitz. The relevant overt act in the state conspiracy was a single sale of a smaller bulk amount of cocaine for resale, by appellant to Ms. Janoski and Mr. Lipinski. Appellant is the only person designated as a named conspirator in both conspiracies. The overt act alleged in furtherance of the state conspiracy occurred during the continuance of the federal conspiracy. The acts of both conspiracies occurred in the same general area. Both conspiracies involved the illegal sale of cocaine.

In light of the absence of any indication that appellant used any source other than Moskovitz as a supply for his wholesale/retail cocaine distribution operation, it would appear that, *vis a vis* appellant, the sale of cocaine which formed the basis of the present state conspiracy charge could quite possibly have been a necessary facet of his ongoing conspiracy with Moskovitz to wholesale and/or retail cocaine. Plainly, the distribution of cocaine from an importer to a wholesaler or retailer *envisions* and in fact *requires* the wholesaler or retailer to enter into further

agreements with others to profitably dispose of the wholesaler's or retailer's inventory, thereby providing capital for future intended purchases from the importer. Thus, the fact that appellant was the sole link between the conspiracies was rendered virtually insignificant in light of appellant's roles as a *buyer* in the federal conspiracy, and as a *seller* in the alleged state conspiracy.

While it is possible that appellant had a separate cocaine source for the sale to Ms. Janowski and Mr. Lipinski and that the state conspiracy was entirely unrelated to the federal conspiracy, on this record, *it is at least equally likely* that the state conspiracy was merely a necessary facet of the broader federal conspiracy. Consequently, we conclude that the Commonwealth failed to meet its burden to establish by a preponderance of the evidence that separate conspiracies were involved, and likewise failed to establish the existence of substantially different interests to be protected by the second conspiracy prosecution within the meaning of the "different required facts/substantially different interests" exception to the bar on reprosecution. *See Commonwealth v. Abbott, supra; Commonwealth v. Mascaro, supra.*[10]

### Conclusion

Based upon the foregoing, the order of the trial court denying appellant's 18 Pa.C.S.A. § 111 motion is REVERSED. Appellant is DISCHARGED as to the state conspiracy charge.

10. We note that, here, even after full disclosure by the Commonwealth, the merit of the 18 Pa.C.S.A. § 111 former jeopardy plea was determined on the basis of the allocation of the burden of *proof.* Had the rules of either the Ninth or Tenth Circuit Courts or those of the state courts noted above applied, our result might well have been different. We also note that the critical information which does not appear on the record, *i.e.* whether appellant's alleged state conspiracy involved cocaine supplied through the federal conspiracy or through a separate source, was within the exclusive knowledge of the defendant rather than the Commonwealth. Thus, the justification quoted above from *Ragins, supra,* regarding access to the critical facts, is not necessarily universally applicable.