575 A.2d 582

**COMMONWEALTH of Pennsylvania, Appellant,**

v.

**Emma MORRIS.**

Superior Court of Pennsylvania.

Argued Jan. 17, 1990.

Filed May 10, 1990.

Laurie Magid, Asst. Dist. Atty., Philadelphia, for Com.

Helen A. Marino, Philadelphia, for appellee.

Before OLSZEWSKI, KELLY and JOHNSON, JJ.

JOHNSON, Judge:

The Commonwealth appeals from the order dismissing the criminal complaint against appellee Emma Morris for lack of jurisdiction on the ground that a state prosecution under state theft statutes is preempted by a penalty provision of the Social Security Act, 42 U.S.C. § 408. We reverse.

On August 18, 1987 Emma Morris was charged in the Municipal Court of Philadelphia with violating 18 Pa.C.S. § 3922, theft by deception, and 18 Pa.C.S. § 3927, theft by failure to make required disposition of funds. The complaint alleged that from November 3, 1981 through April 1,

1984, defendant kept, and used as her own, Social Security benefit checks totaling $9,622.26 that were intended for the maintenance of her son, Danny Morris, at the Norristown State Mental hospital pursuant to Title II of the Social Security Act (Federal Old–Age, Survivors, and Disability Insurance Benefits), 42 U.S.C. §§ 401 et seg. Municipal Court Judge Louis J. Presenza granted defendant's pretrial motion to dismiss, holding that the federal preemption doctrine prevented any state prosecution for the theft of Social Security benefit checks. The Commonwealth appealed the order of the Municipal Court to the Court of Common Pleas. On January 27, 1989 the Honorable Anthony DeFino denied the Commonwealth's appeal and affirmed the decision of the Municipal Court. This timely appeal follows.

The Commonwealth presents a single question for our consideration, whether 42 U.S.C. § 408 (of the codification of Title II of the Social Security Act), which imposes a penalty for improperly obtaining Social Security benefits, preempts state criminal prosecutions under the above-cited state theft statutes based upon the same conduct. We hold that it does not. Section 408 provides:

Whoever-

. . . .

(e) having made application to receive payment under this title [42 USCS §§ 401 et seq.] for the use and benefit of another and having received such a payment, knowingly and willfully converts such a payment, or any part thereof, to a use other than for the use and benefit of such other person;

. . . .

shall be guilty of a felony and upon conviction thereof shall be fined not more than $5,000 or imprisoned for not more than five years, or both.

It is basic to our federal system that the states possess sovereignty concurrent with that of the federal govern-

ment, subject only to limitations imposed by the Supremacy Clause, U.S. Const. art. VI, cl. 2. *Tafflin v. Leavitt,* —— U.S. ——, 110 S.Ct. 792, 107 L.Ed.2d 887 (1990). The notion of coexisting federal and state sovereignty can best be described as:

> [What] is referred to by many as "Our Federalism".... What the concept does represent is a system in which there is sensitivity to the legitimate interests of both State and National Governments, and in which the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States.

*Younger v. Harris,* 401 U.S. 37, 44, 91 S.Ct. 746, 750–751, 27 L.Ed.2d 669, 675–676 (1971) (Black, J. for the court). The principle of preemption, which derives from the Supremacy Clause, invalidates only those state laws which "interfere with, or are contrary to" federal law. *Hillsborough County v. Automated Medical Laboratories, Inc.,* 471 U.S. 707, 712, 105 S.Ct. 2371, 2375, 85 L.Ed.2d 714, 721 (1985). *Gibbons v. Ogden,* 9 Wheat 1, 211, 6 L.Ed. 23 (1824) (Marshall, C.J.).

▉ Because it is the province of Congress to enact legislation, our sole task in determining whether a federal statute preempts a state law or action is to ascertain Congressional intent. *California Federal Savings and Loan Association v. Guerra,* 479 U.S. 272, 280, 107 S.Ct. 683, 689, 93 L.Ed.2d 613 (1987), *cited in Gingold v. Audi–NSU–Auto Union, A.G.,* 389 Pa.Super. 328, 341, 567 A.2d 312, 318 (1989). Under our federalism, the states have the principal responsibility for defining and prosecuting crimes. *Abbate v. United States,* 359 U.S. 187, 79 S.Ct. 666, 3 L.Ed.2d 729 (1959). Therefore, the penalty provision of the Social Security Act at issue here is subject to a presumption that Congress did not intend by its passage to preempt a state's enforcement of its criminal law:

> When Congress legislates in a field traditionally occupied by the States, 'we start with the assumption that the

historic police powers of the States were not to be superceded by [a] Federal Act unless that was the clear and manifest purpose of Congress.'

*California v. ARC America Corporation,* 490 U.S. 93, ——, 109 S.Ct. 1661, 1665–1666, 104 L.Ed.2d 86, 94 (1989) (citations omitted), *quoted in Gingold,* 389 Pa.Super. at 340, 567 A.2d at 319.

■ With this presumption as a foundation, we must now inquire into whether Congress intended preemption either by express statement or by evidencing an intent to occupy the field, leaving no room for state regulation. *Pacific Gas & Electric v. Energy Resources Commission,* 461 U.S. 190, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983). Even if Congress has not entirely displaced state regulation in a given area, state law is preempted if the state law conflicts with federal law so that compliance with both is a physical impossibility. *California v. ARC America Corporation,* 490 U.S. 93, 109 S.Ct. 1661, 104 L.Ed.2d 86 (1989).

There is, as the trial court correctly found, no express statement of intent to preempt state law in the section at issue. Neither did the court find that compliance with both state and federal laws would be a physical impossibility; thus, there exists no conflict with state law. Rather, the trial court decided that the federal penalty provision preempts and thus bars a state criminal prosecution because "the scheme of federal regulation in the area of social security is so pervasive as to make it reasonable for this court to infer that Congress left no room for states to supplement it in *any* manner." Opinion, July 19, 1989 at 5 (emphasis by trial court). This conclusion is error in two respects. First, the United States Supreme Court does not consider the mere fact that Congress enacted a comprehensive legislative scheme to be sufficient evidence that Congress intended to preempt state law in that area:

[T]he subjects of modern social and regulatory legislation often by their very nature require intricate and complex responses from the Congress, but without Congress nec-

essarily intending its enactment as the exclusive means of meeting the problem.

*Hillsborough County v. Automated Medical Laboratories, Inc.*, 471 U.S. at 717, 105 S.Ct. at 2377, 85 L.Ed.2d at 723–724, *quoting New York State Department of Social Services v. Dublino*, 413 U.S. 405, 415, 93 S.Ct. 2507, 2514, 37 L.Ed.2d 688, 696 (1973); *see* 101 Harvard L.Rev. 535 (December 1987), *Getting Away with Murder: Federal OSHA Preemption of State Criminal Prosecutions for Industrial Accidents.*

Most important, the trial court need not have inferred Congressional intent. In 1972, Congress enacted 42 U.S.C. § 1395nn, a penalty provision to cover payments made under Title XVIII, Health Insurance for the Aged and Disabled (Medicare), and 42 U.S.C. § 1396h, a penalty provision to cover payments made under Title XIX, Grants to States for Medical Assistance Programs (Medicaid). Congress employed the same language used in Section 408 in both of these new penalty provisions. Significantly, Congress made it clear, in a committee report on the new penalty provisions, that it intended for these to have the same effect as the existing penalty provisions under the Social Security Act. *See* H.R.Rep. No. 92–231, 92nd Cong., 2d Sess., *reprinted in* 1972 U.S.Code Cong. and Admin. News, 4989, 5176. Section 408 was an existing penalty provision.

In the report, Congress addressed the preemption question for the proposed provisions by stating that these new penalty provisions under Medicare and Medicaid "would be in addition to and not in lieu of any other penalty provisions in state or federal law." H.R.Rep. No. 92–231, 92nd Cong., 2d Sess., *reprinted in* 1972 U.S.Code Cong. and Admin. News 5094. Given that the new provisions were to have the same effect as pre-existing Section 408 and that they employed the same language, Congress gives us no basis upon which to conclude that it intended Section 408 to preempt state criminal prosecutions while the new provisions would not.

The legislative history further demonstrates that Congress intended for the states to take a large measure of responsibility for the programs established by the Social Security Act. "The intent underlying the federal scheme," *Hillsborough County*, 471 U.S. at 714, 105 S.Ct. at 2375, 85 L.Ed.2d at 722, is to share the field of public assistance with the states. The heart of the Social Security Act is the provision of federal funding to aid, not usurp, state involvement in the protection of needy persons:

These programs are state programs, initiated by the states and administered by the states and communities. They are based on the sound concept that the state and local communities can best determine the actual needs of individuals and administer programs of assistance to them.

Social Security Amendments of 1957–60, Statement by Arthur S. Fleming, Secretary of Health, Education and Welfare, before the Senate Committee on Finance, August 8, 1958, p.5. And again:

One of the fundamental concepts of this program has been that the separate states, not the Federal Government, should determine the scope of the program, set standards of need and eligibility, and actually operate the program directly or in cooperation with local agencies.

Social Security Amendments of 1957–60, Office Memorandum of Victor Christgau, Director of the Bureau of Old–Age and Survivors Insurance, June 16, 1958, page 6.

The substance of the Social Security Act bears this out. The act relies upon extensive state participation in most federal benefit programs. It is especially important that the Act includes state participation in disability determinations, a key aspect of the program specified in Title II. *See* 42 U.S.C. § 418, Voluntary Agreements for coverage of State and local employees, and 42 U.S.C. § 421, Disability determinations. This is the title that contains the allegedly preemptive statute in question, § 408.

We find support for our conclusion in cases which address preemption of state law by the Social Security Act general-

ly. For instance, Title IX of the Act, the Federal Unemployment Tax Act, 42 U.S.C. §§ 501 *et seq.*, has been held not to preempt state unemployment compensation to strikers. *New York Telephone Company v. New York State Department of Labor*, 440 U.S. 519, 99 S.Ct. 1328, 59 L.Ed.2d 553 (1979). In *State of Washington v. Bowen*, 815 F.2d 549 (9th Cir.1987) the court held that because the Medicaid program consists of coordinated state and federal efforts that exist within a complementary administrative framework, agency regulations for determining a married person's income do not preempt state community property law. The supreme court in *Dublino, supra,* held that because the Social Security Act's Aid to Families with Dependent Children program is a scheme of cooperative federalism, the federal work incentive program does not, barring a direct conflict, preempt independent state work requirements.

While a double jeopardy problem may arise for a defendant who has already been tried by one sovereign and then is subjected to prosecution by the other, the existence of this potential source of conflict has never prevented dual federal and state jurisdiction for criminal prosecutions, *see* 18 Pa.C.S. § 111; *Commonwealth v. Abbott*, 319 Pa.Super. 479, 466 A.2d 644 (1983), let alone triggered preemption concerns.

We conclude that the Social Security Act itself as well as its legislative history make clear that the federal government did not intend to dominate the field of public welfare to the exclusion of the states. Hence, the argument that Congress intended to preclude state prosecutions for behavior under state criminal statutes constituting theft of Social Security benefits must fail.

For the foregoing reasons, we reverse the order of January 27, 1989.

Order reversed. Case remanded for further proceedings. Jurisdiction relinquished.

KELLY, J., joined and filed a concurring statement.

KELLY, Judge, concurring:

I have no hesitation in joining the able opinion of my learned colleague Judge Johnson. I write separately to note two additional observations.

I agree with the majority that no federal preemption was intended by 42 U.S.C. § 408. Indeed, delegation and integration, rather than preemption, are the settled norm in welfare fraud prevention, detection, and sanction. *See generally Commonwealth v. Ferguson,* 381 Pa.Super. 23, 34–47, 552 A.2d 1075, 1080–86 (1988) (outlining the history of the state's role in combatting fraud in assistance programs); *State Investigation of Fraud in AFDC Program* (U.S.O.I. G.1987) (describing the delegation to states of the principle responsibility to prevent, detect and sanction AFDC welfare fraud, discussing federal efforts to facilitate state enforcement efforts); *Pennsylvania Office of Fraud and Abuse Investigation and Recovery—Annual Report 1986–87* (1988) (outlining state efforts to prevent state and federal welfare fraud). Indeed, recent state and federal cost sharing arrangements for welfare fraud enforcement efforts have resulted in dramatic improvements in welfare fraud recoupment. *See Commonwealth v. Ferguson, supra,* 552 A.2d at 1086. I note that the federal government's primary reliance on *state* enforcement efforts to combat welfare fraud is typified by the requirement that states administering AFDC and food stamp programs adopt fraud detection plans. *See e.g.* 45 CFR § 235.110.

In *Commonwealth v. Ferguson, supra,* this author explained:

Pennsylvania has a paramount interest in seeing that its limited public assistance funds are distributed as provided by law. If some welfare recipients receive more than their rightful share of these finite resources through fraud, then it is likely that other needy persons will be adversely affected either by reductions in assistance or by the Commonwealth's inability to increase assistance. Moreover, deterrence of welfare fraud is necessary to maintain public support for such programs.

552 A.2d at 1085. The same is true of finite federal assistance funds, which are intended to shoulder a portion of the state's total public assistance burden.

With regard to the double jeopardy issue, I note that the analysis set forth in *Commonwealth v. Abbott*, 319 Pa.Super. 479, 466 A.2d 644 (1983), was expanded upon in *Commonwealth v. Savage*, 388 Pa.Super. 561, 587, 566 A.2d 272 (1989). *Abbott* and *Savage* both establish that the mere availability of a federal forum for similar fraud charges in no way precludes this state prosecution from proceeding on state charges also applicable to appellant's criminal misconduct.